The CINCINNATI INSURANCE COMPANY, the Cincinnati Casualty Company, and the Cincinnati Indemnity Company, Plaintiffs,

v.

CENTECH BUILDING CORPORATION, William Massey & Associates A.K.A. William Massey & Associates, Inc., William H. Massey, Dynamic Development Group, LLC., BB & T Bank of South Carolina, Betty Harbin Little, and Lanneau William Lambert, Jr., Defendants,

and

Dynamic Development Group, LLC, Defendant/Third–Party Plaintiff,

v.

Smith Helms Mulliss & Moore, LLP Third–Party Defendant.

Nos. 1:00 CV 00280, 1:00 CV 00281, 1:00 CV 00282, 1:00 CV 00283, 1:00 CV 00284.

United States District Court, M.D. North Carolina.

Oct. 2, 2003.

Andrew Albert Vanore, III, Brown Crump Vanore & Tierney, L.L.P., Raleigh, NC, Thomas E. Crafton, Timothy D. Martin, Crafton Martin Ogburn & Zipperle, PLLC, Louisville, KY, for plaintiffs.

John Keating Wiles, Joseph Blount Cheshire, V, Cheshire Parker Schneider Bryan

& Vitale, Raleigh, NC, Fred M. Wood, Jr., Kilpatrick Stockton, L.L.P., Charlotte, NC, for defendants.

## *MEMORANDUM OPINION*

BEATY, District Judge.

### I. INTRODUCTION

This case involves numerous motions that are currently before the Court for consideration. The Court will first outline its rulings here and then set forth the reasoning supporting these rulings in more detail below. The first motion before the Court was Defendant BB & T Bank of South Carolina's ("BB & T") Motion for Summary Judgment [Document # 56] which was filed on November 29, 2001 by then-counsel for BB & T, Mr. E. Wade Mullins, III. ("Mullins"), who later withdrew as attorney for BB & T. Because of other developments in this case, BB & T's first Motion for Summary Judgment [Document # 56] will be DENIED without the need for substantial discussion, except as noted below.[1] Over a year later, on December 9, 2002, Plaintiffs, The Cincinnati Insurance Company, The Cincinnati Casualty Company, and the Cincinnati Indemnity Company (collectively "Plaintiffs" or "Cincinnati") filed a Motion to Amend its First Amended Pleadings [Document # 115]. This motion will be GRANTED in part and DENIED in part, as discussed in detail below.

On January 2, 2003, Defendant Lanneau William Lambert ("Lambert") filed a Motion for a Hearing on Plaintiffs' Motion to Amend its First Amended Pleadings [Document # 123]. On January 6, 2003, Defendant Betty Harbin Little ("Little") and third-party Defendant Smith Helms Mulliss & Moore ("Smith Helms") filed a Motion Joining in Lambert's Request for a Hearing on Plaintiffs' Motion to Amend Pleadings [Document # 125]. The Court effectively granted these two motions by holding a hearing on May 19, 2003, and, therefore, this Memorandum Opinion will not further address either of these motions.

In addition to its first Motion for Summary Judgment described above, BB & T filed a second Motion for Summary Judgment [Document # 133] on February 10, 2003. This motion was filed by BB & T's present attorney, Mr. Donald G. Sparrow, after attorney Mullins ceased to represent BB & T. In light of the manner in which the proceedings have evolved, the Court deems it more appropriate to consider BB & T's second Motion for Summary Judgment for disposition of this matter in lieu of its first Motion for Summary Judgment [Document # 56], which has been rendered moot because of amendments Plaintiffs were allowed to make with respect to BB & T. For the reasons stated herein, BB &

---

1. The Court need not enter into an extensive discussion to explain the denial of this Motion. The central premise of the Motion is that "BB & T has no legally cognizable interest in the outcome of this action because it was made whole when the loan was paid in full. Plaintiffs have no legally cognizable interest in the outcome of this action because BB & T is willing to waive any claims or rights it may still have under the bonds and dual obligee rider. Therefore, Plaintiffs' action is moot." (BB & T's Mem. in Supp. of [First] Mot. for Summ. J. at 4.) Since this Motion was filed, this case has evolved significantly to include Cincinnati filing a First

Amended Complaint which alleged that BB & T and its authorized representatives were negligent and/or breached their fiduciary duties so as to support Cincinnati's claim for indemnity and contribution against BB & T as a result. For this reason, the basis for BB & T's initial Motion for Summary Judgment [Document # 56] is no longer relevant and it must therefore be denied. Further, the attorney responsible for drafting the Motion, at the time of its filing, was counsel for both BB & T and DDG, but he has since terminated his representation of BB & T and now only represents DDG.

T's Motion for Summary Judgment [Document # 133] will be Granted.

The next motion filed was by Plaintiffs on February 10, 2003, and is a Motion to Substitute Second Amended Complaint [Document # 135]. This motion will be GRANTED, subject to the limitations discussed below. Also on February 10, 2003, Plaintiffs filed a Motion for Summary Judgment with Respect to the Counterclaims of Defendant Dynamic Development Group, LLC ("DDG") and BB & T [Document # 136].[2] For the reasons discussed herein, Plaintiffs' Motion for Summary Judgment [Document # 136] will be GRANTED with respect to two of the counterclaims asserted by DDG against Plaintiffs, namely for alleged violations of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") and DDG's counterclaim against Plaintiffs for common law bad faith. In addition, on February 10, 2003, Plaintiffs filed a Motion for Summary Judgment on Bond Validity [Document # 138] which will be DENIED for the reasons stated herein.

On February 11, 2003, Defendant Lambert filed a Motion for Summary Judgment [Document # 140] as to the claims asserted against him by Plaintiffs. Although it was not filed until July 9, 2003, relevant to Defendant Lambert's Motion for Summary Judgment is Defendant Lambert's Motion to Strike Gratuitous Arguments Concerning Defendant Lambert Contained in Plaintiffs' Response to Defendant BB & T's Motion for Summary Judgment [Document # 178]. Subsequently, on July 21, 2003, Plaintiffs filed a Response to Lambert's Motion to Strike and a Cross–Motion to Strike [Document # 181]. As will be discussed herein, both of these Motions to Strike [Documents # 178 and # 181] will be DENIED. However, for the reasons stated herein, Defendant Lambert's Motion for Summary Judgment [Document # 140] will be GRANTED.[3]

On February 12, 2003, Defendant Little and Third–Party Defendant Smith Helms filed a Motion for Summary Judgment [Document # 143] which is directed to all claims of Plaintiffs and the crossclaims of Defendant DDG. For reasons to be discussed, Defendant Little and Third–Party Defendant Smith Helms' Motion for Summary Judgment [Document # 143] will be GRANTED in all respects.

The next motion is Plaintiffs' Motion to Cite Supplemental Authority in Favor of Its Motion for Summary Judgment on DDG's and BB & T's Counterclaims [Document # 174]. Given the nature of this Motion and the fact that it is unopposed, the Court will GRANT the Motion without further discussion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a large-scale construction project in which Performance and Payment Bonds and a Dual Obligee Rider, issued in connection with the loan for the project, were allegedly fraudulently created. When the project failed to proceed according to schedule, attempts were

---

2. Although Plaintiffs' Motion is labeled as including a request for summary judgment on counterclaims asserted by BB & T against Plaintiffs, the Court finds that BB & T has not brought any counterclaims against Plaintiffs.

3. The Court notes that as a result of the Settlement Conference conducted by the Court on September 22, 2003, Plaintiffs negotiated settlements with Defendants Lambert,

Little, and Smith Helms. However, the discussion of their involvement in this dispute was so central to the format of the Court's decision that it was impossible to delete references to these Defendants. The outcome of the settlement is in no way adversely affected by the decision the Court has reached here with respect to Defendants Lambert, Little, or Smith Helms.

made by various parties to collect on the bonds. The present litigation seeks to determine who should bear the loss caused by what Plaintiffs argue was the improper issuance of the bonds.

On September 10, 1990, Cincinnati entered into an Agency Agreement with Massey & Associates, an independent insurance agency, and its president, William H. Massey ("Massey"), wherein it was agreed that Massey & Associates and Massey would act as sales agents for Cincinnati. (Complaint [4] ¶ 9.) Some years later, on August 25, 1995, Massey was given a Letter of Authority for use with Power of Attorney from Cincinnati. (Cincinnati's Mem. in Supp. of Mot. for Summ. J. on the Issue of Bond Validity at 3.) This document, for the first time, conferred authority on Massey to execute surety bonds on behalf of Cincinnati. (*Id.*) The Letter of Authority was sent to the Massey Agency along with a "bond kit" which contained, among other things, an embossed Cincinnati seal, bond forms, Cincinnati wafer seals, and powers of attorney ("POAs") naming Massey, and others in his agency, as Cincinnati attorneys-in-fact for the purpose of executing authorized Cincinnati surety bonds if the bonds fell within the $1,600,000 authority expressly set forth in the POAs. (*Id.*) Massey and the authorized employees of the Massey Agency were not authorized to use the POAs for the purpose of executing Cincinnati contract bonds, including Performance and Payment bonds such as the ones at issue in this case, unless and until they received prior written approval from Cincinnati. (*Id.*)

Between August 1995 and October 1996, while the Massey Agency was considered to be a "bonding agent" for Cincinnati, Cincinnati experienced various problems with Massey and his Agency. The Massey Agency failed to comply with its agreement with Cincinnati by failing to report authorized bonds which it had executed. (*Id.*) Cincinnati reviewed this nonreporting issue with Massey and determined that the problem was a clerical oversight. (*Id.*) Subsequently, Massey established internal procedures which corrected the problem. (*Id.*) During the same period of time, however, Cincinnati learned that the Massey Agency was selling insurance policies and collecting single annual premiums from the insureds while making only monthly payments to Cincinnati for the annual premiums that had been collected. (*Id.*) This was a violation of the general Agency Agreement between the Massey Agency and Cincinnati, which, Cincinnati asserts, prompted Cincinnati to change the nature of its relationship with the Massey Agency.

On October 4, 1996, Cincinnati terminated its Agency Agreement with Massey & Associates by letter and thereby revoked Massey's ability to execute any new bonds on behalf of Cincinnati. (Compl. ¶ 11 & Exh. B.) On October 7, 1996, Daniel T. McCurdy, Senior Vice President and Bond Manager for Cincinnati, wrote Massey directing him to destroy all Cincinnati powers of attorney previously provided to him and Massey & Associates by Cincinnati. (Compl. ¶ 12 & Exh. C.) Cincinnati also directed Massey to return all the other materials used to execute bonds, that is, the Cincinnati bond forms, the embossed seal, and the wafer seals. (Cincinnati's Mem. in Supp. of its Mot. for Summ. J. on the Counterclaims of DDG and BB & T at

---

**4.** The First Amended Complaint [Document # 77], which Plaintiffs filed on June 6, 2002, is the document that currently forms the basis of this action. It should be noted that the First Amended Complaint attached a copy of the original Complaint which it "incorporated ... by reference as though fully set forth herein." (First Am. Compl. ¶ 6.) Therefore, the Court will cite to both documents as necessary.

3.) Two days later, Massey, on behalf of Massey & Associates, signed a Limited Agency Agreement acknowledging that the Agency Agreement with Cincinnati had been terminated as of October 4, 1996, and that Massey would act as a limited agent for Plaintiffs only for the purpose of servicing policies which were issued prior to the October 4, 1996, termination date. (Compl. ¶ 13 & Exh. D.) During the time span relevant to this action, Cincinnati never informed the general public nor the North Carolina Department of Insurance ("NCDI") of the termination of Massey's producer capacity and the creation of the Limited Agency Agreement. Cincinnati, however, argues that none of the parties involved in the loan closing for the Sleep Inn Motel ever contacted NCDI to determine if Massey or his agency were affiliated with Cincinnati.

A few months later, on January 15, 1997, Cincinnati's Bond Department received a memo from Massey, on behalf of Massey & Associates, wherein Massey represented to Cincinnati that he had destroyed all powers of attorney in accordance with Mr. McCurdy's letter of October 7, 1996. (Compl. ¶ 14 & Exh. E.) Nevertheless, sometime after the termination of the initial Agency Agreement with Massey, Cincinnati instructed a field representative to go to the Massey Agency to physically retrieve the "bond kit" supplies. (Donovan Dep. at 68–70.) The field representative reported back to Cincinnati headquarters that he could not pick up the materials because he believed that Massey's wife kept a gun in her purse and that she harbored resentment against Cincinnati; the representative therefore feared for his personal safety if he were to go to the Massey Agency. (*Id.;* Allonier Dep. at 14–15.) Thus, there remained some concern at Cincinnati that Massey still had bond materials, but Cincinnati took no additional action to retrieve the bond materials. (Donovan Dep. at 68–70.)

In January 1999, Dynamic Development Group, LLC entered into a construction contract with Centech Building Corporation ("Centech") in the amount of $2,600,000 for the construction of a Sleep Inn Motel at Interstate 77 and Highway 150 in Iredell County, North Carolina (hereinafter the "Sleep Inn Project"). (Compl.¶ 15.) DDG obtained financing for the construction through BB & T, which retained Lambert to represent BB & T with respect to the loan closing. Mr. Nitesh Lala, a principal with DDG, asked Smith Helms to assist DDG with respect to the closing of the construction loan. Smith Helms assigned attorney Little the responsibility to perform the work for DDG on the closing, under the supervision of Mr. Saxby Chaplin, another attorney with Smith Helms.

In the past, Centech, the general contractor for the Sleep Inn Project, had obtained most of its insurance and bond needs from the Massey Agency. (Cincinnati's Mem. in Supp. of Its Mot. for Summ. J. on the Counterclaims of DDG and BB & T at 3.) During the duration of the business relationship between the Massey Agency and Centech, the Massey Agency obtained performance and payment bonds through Travelers Insurance Company, Amwest Surety, and other commercial sureties, but never through Cincinnati. (*Id.*) At the time of the Sleep Inn Project, Centech was having financial problems and, consequently, its primary surety at the time, Travelers, refused to bond Centech for the Project. (*Id.* at 3–4.) The Massey Agency was particularly motivated by its own interest to obtain the bonds Centech needed for the Sleep Inn Project because if Centech could not complete this Project, it could not pay the Massey Agency $30,000 in premiums it owed the Agency for such things as workers' compensation and general liability coverage. (*Id.* at

4.) In order to prevent Centech from losing the Sleep Inn Project contract while Massey attempted to obtain legitimate bonds from Amwest Surety, Massey decided to "manufacture" a fraudulent payment bond, a fraudulent labor and performance bond, and a fraudulent Dual Obligee Rider to make it appear that Centech had met the requirements of the contract. (*Id.;* Massey Dep. at 70.)

According to Massey, when he manufactured the fake bonds he copied a previously executed Cincinnati performance bond and a previously executed labor and material payment bond. Massey then modified the bond in some fashion by whiting-out the blanks on an old bond, and then inserted the necessary information on a photocopied form. (Cincinnati's Mem. in Supp. of Its Mot. for Summ. J. on the Counterclaims of DDG and BB & T at 4.) As for the Dual Obligee Rider, Massey indicated that he did not have a standard dual-obligee-rider form because those forms had not been included in his original "bond kit" from Cincinnati; therefore, he used a Cincinnati indemnity-type performance bond provided to him, and he manually typed "Dual Obligee Rider" at the top left of the bond form. Massey's "manufactured" bonds lacked an original agent's signature, did not have the proper embossed seal or wafer seal, and did not have a power of attorney attached. (*Id.*)

Massey provided the manufactured bonds to Centech's principal owner, Darrell Pendergraph, who in turn provided them to Nitesh Lala of DDG. Nitesh Lala then provided them to DDG's attorney, Ms. Little, who, on two separate occasions, noted a typographical error on the bonds and informed Mr. Lala of the mistake. (Br. of Little and Smith Helms in Supp. of Mot. for Summ. J. at 4.) Each time, Mr. Lala returned the bonds to Pendergraph, who had Massey correct the mistake, and then Pendergraph provided them back to

Mr. Lala who resubmitted them to Ms. Little. Ms. Little then forwarded the bonds to BB & T's attorney, Mr. Lambert, who turned them over to his client, BB & T. (Mem. in Supp. of Lambert's Mot. for Summ. J. at 4.)

The construction loan closed on February 22, 1999, but it was not until March 16, 1999, that Ms. Little forwarded the Dual Obligee Rider to Mr. Lambert, who in turn forwarded the Dual Obligee Rider to BB & T. (Cincinnati's Mem. in Supp. of Mot. for Summ. J. on the Issue of Bond Validity at 12.) Not long after the Sleep Inn Project started, Centech was unable to keep up with the project schedule, and subcontractors and vendors began calling requesting information from Pendergraph regarding the bonds, in order to file payment bond claims. (Cincinnati's Mem. In Supp. of Mot. for Summ. J. on the Counterclaims of DDG and BB & T at 5.) Cincinnati alleges that it was only when it began to receive claims from some of the subcontractors and/or vendors for the Sleep Inn Project that it began to discover that something was wrong. (*Id.*) Subsequently, Cincinnati searched its files but could not find any record of issuing bonds for the Sleep Inn Project, or for Centech. (*Id.*) Further investigation revealed that Massey had issued fraudulent Cincinnati bonds for an approximate total of $9,000,000, including those issued in connection with this litigation. (*Id.*)

On March 21, 2000, Plaintiffs filed their original Complaint, entitled Complaint for Declaratory Judgment [Document #1], against Centech, Massey & Associates, Massey individually, DDG, and BB & T. As its prayer for relief, this document requested that the "Court issue a Declaratory Judgment declaring that Cincinnati has no liability under the Bond and same is void *ab initio*." and also a request was made for "costs and fees expended, including reasonable attorney's fees." (Compl.

at 7.) However, the document that presently forms the basis for Plaintiffs' action is the First Amended Complaint ("FAC") [Document # 77], which was actually filed on June 6, 2002. The FAC fully incorporates the original Complaint by reference. Moreover, the FAC names attorneys Lambert and Little as additional Defendants and contains several counts against each of them. As will be subsequently addressed, an additional count in the First Amended Complaint was alleged against BB & T. Specifically, Count I of the FAC alleges that "Lambert's breach of his professional and fiduciary obligations to the Parties was a substantial and primary cause of the damages and injuries, if any, suffered by BB & T, DDG and Cincinnati" and, as a result, asserts that "Cincinnati is entitled to indemnification and contribution from Lambert . . . ." (FAC ¶¶ 15, 16.) Count II of the FAC makes the exact same allegations as Count I, but they are brought against Little. (FAC ¶¶ 17–20.) Count III of the FAC is directed towards BB & T and alleges that "BB & T, acting by and through its agents, representatives, employees and officers, failed to exercise reasonable care in the performance of loan closing transactions related to the Loan," and that "BB & T's breach of its duties, including any fiduciary obligation owed to DDG and Cincinnati, was a substantial factor in Massey providing fraudulent bonds on behalf of Centech to DDG." (FAC ¶¶ 22, 23.) Consequently, Plaintiffs assert, "Cincinnati is entitled to indemnification and contribution from BB & T for any amounts it is required to pay as a result of BB & T's breach of its duties owed to DDG and subsequently to Cincinnati." (FAC ¶ 24.) Count IV asserts that "Little contract[ed] with the parties to the Loan to provide legal services with regard to the closing of the Loan," and that "[t]he parties to the Loan intended that Cincinnati, as the alleged surety on the construction project, would benefit from Little's closing of the construction loan." (FAC ¶¶ 26, 28.) The FAC then alleges that "Little breached [her] contract with the parties by failing to exercise reasonable care in the performance of her duties as closing attorney on the Loan," and that "Cincinnati, as an intended beneficiary of the legal-services contract, was damaged as a result of Little's breach of her contract in an amount which exceeds the minimum jurisdictional limit of this Court." (FAC ¶¶ 29, 30.) Count V of the FAC makes the exact same allegations as Count IV, only they are brought against Lambert. (FAC ¶¶ 31–36.) Count VI of the FAC asserts that "Little negligently misrepresented the validity of the surety bonds . . . to the determent [sic] of the parties to the Loan and Cincinnati," and "as a result Cincinnati is entitled to recover from Little those damages which are found to have been caused by those negligent misrepresentations." (FAC ¶¶ 39, 40.) Finally, Count VII of the FAC makes the exact same allegations as Count VI, but they are brought against Lambert. (FAC ¶¶ 42–45.)

The FAC premises this Court's jurisdiction on 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00. (First Am. Compl. ¶ 4.) Plaintiffs further assert that "[a]ll Defendants reside or conduct business in this District, and venue is therefore proper in this District pursuant to 28 U.S.C. § 1391(a)." (First Am. Compl. ¶ 5.) None of the parties have challenged the propriety of jurisdiction and venue, and the Court therefore accepts Plaintiffs' jurisdictional assertions and finds that the matter is properly before it.

## III. DISCUSSION

### A. Summary Judgment Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any mate-

rial fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir.1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992). Once the moving party has met this burden, the adverse, or nonmoving party, must set forth specific facts showing that there is a genuine issue for trial. *Id.* In so doing, the adverse party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510, 91 L.Ed.2d 202; *Catawba Indian Tribe,* 978 F.2d at 1339. In other words, the nonmoving party must show "more

than ... some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of its position is insufficient to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Catawba Indian Tribe,* 978 F.2d at 1339.

 B. Lambert's Motion to Strike Gratuitous Arguments Concerning Defendant Lambert Contained in Plaintiffs' Response to Defendant BB & T's Motion for Summary Judgment [Document # 178]

Cincinnati's Cross–Motion to Strike [Document # 181]

■ On July 9, 2003, following Cincinnati's filing of a response, pursuant to an extension granted by the Court, to BB & T's Motion for Summary Judgment, Defendant Lambert filed a Motion to Strike what he alleges are gratuitous arguments contained in Cincinnati's response to the BB & T Summary Judgment Motion. Subsequently, on July 21, 2003, Plaintiffs filed a Response to Lambert's Motion to Strike, combined with a Cross–Motion to Strike a portion of the argument contained in Lambert's Motion to Strike.

Because Lambert was BB & T's attorney at all times relevant to this litigation, Cincinnati cannot argue the alleged duties and liabilities of BB & T without reference to BB & T's attorney, Lambert. The Court does not find there to be anything improper about the arguments contained in the Cincinnati response to the BB & T Summary Judgment Motion. With regard to Cincinnati's Cross–Motion to Strike, the Court will deny this request as well, based upon the Court's denial of the substantive portion of Lambert's Motion to Strike. Without question, the Court will consider only arguments which it deems to be properly before it. Accordingly, the Court will

deny Lambert's Motion to Strike as well as Cincinnati's Cross–Motion to Strike.

### C. Lambert's Motion for Summary Judgment [Document # 140]

Little and Smith Helms' Motion for Summary Judgment [Document # 143]

The Court will first address Lambert's Motion for Summary Judgment and then Little and Smith Helms' Motion for Summary Judgment because they raise similar issues. Within this discussion, the Court will first examine Lambert's Motion for Summary Judgment, then turn to the Motion for Summary Judgment filed by Little and Smith Helms. As will become obvious, the Court's ruling on these two motions will of necessity affect the Court's ruling on some of the other motions to be addressed herein.

 Defendant Lambert argues for Summary Judgment principally based on his contention that he owed no duty to Cincinnati either on the basis of the existence of a fiduciary duty, breach of contract, or negligent misrepresentation. First, he argues that there is no evidence that he represented Cincinnati or that he had any understanding that he would protect Cincinnati's interests. More importantly, Lambert argues that there is no evidence that he ever made any representations that Cincinnati could have relied upon in issuing the bonds. Thus, Lambert asserts, Cincinnati has no basis for its breach of professional/fiduciary obligation claim. As for Plaintiffs' breach of contract claim against him, Lambert argues that the loan agreement between his client, BB & T, and DDG explicitly states that other parties are "not benefitted" from the transaction and that, even if Cincinnati was a beneficiary, it was merely an incidental one, so as not to be able to bring suit under a third-party-beneficiary theory. Finally, regarding the negligent misrepresentation claim, Lambert argues that

all of his action, or alleged inaction, with regard to the bonds took place after they were issued; therefore, Cincinnati could not have relied on anything Lambert did, or did not do, when the bonds were issued. Cincinnati responds to Lambert's argument that he had no duty to Plaintiffs by contending that a cause of action based on tort can be maintained based on the underlying legal-services contract between Lambert and BB & T, if certain factors are present, that is, if Cincinnati was an intended beneficiary of that contract. As for the negligent misrepresentation claim, Cincinnati argues, however, that a failure to speak can act as a misrepresentation and that Lambert had a duty to disclose the defects in the bonds.

 Nevertheless, the central principle which resolves Lambert's Summary Judgment Motion is straightforward, that is, as Lambert asserts, he owed no legal duty to Cincinnati. Consistent with that conclusion, the Court finds that no evidence has been presented suggesting that Lambert represented Cincinnati or that he would protect Cincinnati's interests. Nor is there evidence that Lambert made any representations which Cincinnati relied upon in any way. Thus, there is no basis for indemnification and contribution being owed by Lambert to Cincinnati. Further, common law indemnity exists in tort situations only

> [w]here two persons are jointly liable in respect to a tort, one being liable because he is the actual wrongdoer, and the other by reason of constructive or technical fault imposed by law, the latter, if blameless as between himself and his cotortfeasor, ordinarily will be allowed to recover full indemnity over against the actual wrongdoer.

*Hayes v. City of Wilmington,* 243 N.C. 525, 543, 91 S.E.2d 673, 686 (1956); *see also* N.C. Gen.Stat. § 1B–1(a) (Entitled "Right to contribution," the relevant por-

tion states, "Except as otherwise provided in this Article, where two or more persons become jointly or severally liable in tort for the same injury . . ., there is a right of contribution among them . . . ."). Here however, Cincinnati's liability on the bonds would be a matter of contract law as to whether the bonds are valid, not a matter of "constructive or technical fault imposed by law," as would be required under *Hayes*. Thus, even if Lambert owed a duty to Cincinnati and had tortiously breached that duty, Cincinnati would still not be a "cotortfeasor," *See Hayes*, 243 N.C. at 543, 91 S.E.2d at 686, such that it would be entitled to contribution. Accordingly, the Court will grant Lambert's Motion for Summary Judgment as to Plaintiffs' claim for indemnity and contribution contained in Count I because there is no genuine issue of material fact as to whether Lambert made any representations which Cincinnati relied upon, or as to whether Cincinnati was a cotortfeasor that would be entitled to contribution.

Cincinnati's breach of contract claim against Lambert also alleges that a third-party-beneficiary relationship existed in which Cincinnati was an intended beneficiary of the legal-services contract between Lambert and BB & T. Such a claim requires Cincinnati to present evidence "that the contract was entered into for [its] direct, and not incidental, benefit." *State ex rel. Long v. Interstate Cas. Ins. Co.*, 120 N.C.App. 743, 747, 464 S.E.2d 73, 76 (1995) (internal quotations omitted). In so doing, "the court must construe the contract strictly against [Cincinnati,] the third par-

ty seeking to enforce the contract." *RPR & Assocs. v. O'Brien/Atkins Assocs.*, 24 F.Supp.2d 515, 521 (M.D.N.C.1998) (citing *Chem. Realty Corp. v. Home Fed. Sav. & Loan*, 84 N.C.App. 27, 351 S.E.2d 786 (1987)). To recover on the contract by showing that it was something more than an incidental beneficiary, Cincinnati must demonstrate that it falls within one of two categories, either a "donee beneficiar[y], where it appears that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary," or a "creditor beneficiar[y], where no purpose to make a gift appears and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary." *Matternes v. City of Winston–Salem*, 286 N.C. 1, 12, 209 S.E.2d 481, 487 (1974) (internal quotations omitted). Cincinnati has not shown either. There is no evidence of any gift intention so as to benefit Cincinnati in the legal-services contract between BB & T and Lambert, nor is there evidence that either Lambert or BB & T owed any pre-existing duty to Cincinnati that they somehow intended to satisfy by operation of the legal-services contract. Accordingly, the Court concludes that Cincinnati was not an intended third-party beneficiary of the legal-services contract between BB & T and Lambert and will, therefore, grant Lambert's Motion for Summary Judgment as to Count V of the First Amended Complaint because there is no genuine issue of material fact as to whether Lambert owed a contractual duty to Cincinnati.[5]

---

**5.** There are other reasons for granting Lambert's Motion for Summary Judgment as to the breach of contract claim. Among them is paragraph 9.1 of the Loan Agreement between BB & T and DDG, which called for various things to be done as conditions to the closing of the loan, and explicitly stated that other parties were "not benefitted" from the transaction. (*See* Mem. in Supp. of Lambert's Mot. for Summ. J., Exh. H.) Construing the

contract strictly against Cincinnati, as the Court must, there can be no doubt that this is an indication that there were not to be any third-party beneficiaries.

Another reason for granting Lambert's Summary Judgment Motion as to the breach of contract claim is the fact that Cincinnati's response to the Motion does not address any of Lambert's arguments concerning this

■ Cincinnati's final Count against Lambert alleges that he "negligently misrepresented the validity of the surety bonds ... to the determent [sic] of the parties to the Loan and Cincinnati." (First Amended Complaint ¶ 43.) Again, the lack of any evidence that a duty was owed on the part of Lambert to Cincinnati is the root of why this claim fails. Cincinnati argues that because Lambert's client, BB & T, had a right to rely on Lambert's legal work in the DDG loan transaction, Cincinnati should be able to, essentially, borrow that reliance. The Fourth Circuit directly rejected such an argument in *Semida v. Rice*, 863 F.2d 1156 (4th Cir. 1988). In *Semida*, along with suing a Mr. Haid, who was his former business associate, Mr. Samnite sued an accountant employed by Haid, a Mr. Rice, for professional negligence. In analyzing this claim, the Fourth Circuit considered the applicability of "a developing modern rule that an accountant may be liable for his negligence to a limited class of persons whose injury was reasonably foreseeable, as well as to his direct employer with whom he is in privity." *Semida*, 863 F.2d at 1160 (citing Restatement (Second) of Torts § 552). Even in light of such a rule, the court concluded that Samnite had no claim against Rice.[6] The court's wording is easily substituted with the facts of this case because "there was no detrimental reliance by [Cincinnati] on [Lambert's] report and comments. Rather [Cincinnati] claims to have been injured as a result of the reliance of others on [Lambert's] work product. There is no authority which would permit recovery under these circumstances." *Id.* Recently, North Carolina specifically adopted section 552 of the Restatement (Second) of Torts, wherein the North Carolina Court of Appeals reached a conclusion similar to the *Semida* court regarding the reliance element of negligent misrepresentation, as defined by section 552 of the Restatement (Second) of Torts. *See Brinkman v. Barrett Kays & Assocs.*, 155 N.C.App. 738, 575 S.E.2d 40 (2003). The *Brinkman* court set forth the elements of negligent misrepresentation, stating that "[i]t has long been held in North Carolina that the tort of negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care." *Brinkman*, 155 N.C.App. at 742, 575 S.E.2d at 43–44 (internal quotations omitted). The court then explained that in North Carolina "[t]he requirement of justifiable reliance is derived from Restatement § 552(1), providing 'liability for pecuniary loss caused to [the plaintiffs] by their justifiable reliance upon the information,'" *id.* at 742, 575 S.E.2d at 44 (quoting Restatement Second of Torts § 552(1)), and noted the significant fact that "[t]he North Carolina

claim. The Motion is therefore unopposed as to this claim and may be granted on that basis alone. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985) *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (holding that "[t]hough the burden of proof rests initially with the moving party, when a motion for summary judgment is made and supported as provided in Rule 56, the nonmoving party must produce 'specific facts showing that there is a genuine issue for trial,' rather than resting upon the bald assertions of his pleadings.") (quoting Fed.R.Civ.P. 56(e)).

6. The Fourth Circuit noted, however, that there was no direct Virginia authority citing the modern rule. *Semida*, 863 F.2d at 1160. In fact, the only relevant Virginia case that cites *Semida* specifically declined to adopt section 552 of the Restatement (Second) of Torts. *See Ward v. Ernst & Young*, 23 Va. Cir. 444, 1991 WL 834938, at *4 (1991) (holding that under Virginia law, privity is an absolute requirement in professional malpractice cases).

Supreme Court [has] held that justifiable reliance requires actual reliance." *Id.* Because "[a]ctual reliance is direct reliance upon false information," *id.* (internal quotations omitted), where there has been no evidence that Cincinnati actually relied upon any false information supplied by Lambert, this Court's conclusion is the same as that reached in *Brinkman* to the extent that "[d]efendants have met their burden of proof that there is an essential element of plaintiffs' claim of negligent misrepresentation regarding which there is no genuine issue of material fact and therefore summary judgment [is] properly granted to defendants." *Id.* at 743, 575 S.E.2d at 44. Accordingly, the Court will grant Lambert's Motion for Summary Judgment as to Count VII of the First Amended Complaint because there is no genuine issue of material fact as to whether Cincinnati could have detrimentally relied on Lambert's work for BB & T.[7]

Having granted Lambert's Motion for Summary Judgment [Document # 140] as to all three of the Counts Plaintiffs have brought against him, the Court will now analyze the Little and Smith Helms Motion for Summary Judgment [Document # 143]. The Little and Smith Helms Motion for Summary Judgment is directed not only towards the claims brought

against Little by Cincinnati, but also requests Summary Judgment on the crossclaims which DDG levied against Little as a codefendant, and against Smith Helms as a third-party defendant. DDG brought its crossclaims against Little and Smith Helms in a Third–Party Complaint [Document # 100] which was filed on August 8, 2002. Specifically, DDG has alleged a claim of legal malpractice and a claim for breach of contract against both Little and Smith Helms. (Answer and Crossclaims of DDG to Am. Compl. and Third–Party Compl. ¶¶ 48–77.) Little and Smith Helms raise various substantive arguments as to why summary judgment is appropriate against Cincinnati's claims, as well as against DDG's claims. However, the Court need not analyze these arguments because it finds that both Cincinnati's and DDG's claims against Little and Smith Helms are barred by the applicable statutes of limitations.

 The Court will first examine Little and Smith Helms' statute of limitations arguments as they relate to the two crossclaims asserted against them by DDG. Both of DDG's claims against Little and Smith Helms essentially are claims for legal malpractice[8] and, as such, they both are subject to the statute of limitations

---

7. Lambert also contends this claim should be dismissed because it does not give rise to any damages which Cincinnati may recover from Lambert. That is, if the bonds are deemed valid, then Cincinnati cannot have been harmed as a result of Lambert's having overlooked alleged defects in the bonds if the alleged defects were not sufficient to invalidate the bonds; conversely, if the bonds are deemed invalid, then Cincinnati will not be liable on them and will not have been damaged. While not determinative here, this argument provides a further basis for granting Lambert's Motion for Summary Judgment as to Count VII.

8. The Court recognizes that DDG's second claim against Little and Smith Helms is for

breach of contract. Nevertheless, for statute of limitations purposes the claim's central allegation, that "Little and SHMM impliedly warranted that their work would be performed and undertaken with due care and in accordance with the prevailing standard of professionalism," (Answer and Crossclaims of DDG to Am. Compl. and Third–Party Compl. ¶ 75), places it within the broad reach of N.C. Gen.Stat. § 1–15(c), which covers "cause[s] of action for malpractice arising out of the performance of or failure to perform professional services ...." In essence, the breach of contract claim, based upon the language of DDG's Third–Party Complaint is no more than a repeat of the legal malpractice claim asserted against Little and Smith Helms.

period set forth in North Carolina General Statutes section 1–15(c). In pertinent part, that statute reads as follows:

[A] cause of action for malpractice arising out of the performance of or failure to perform professional services shall be deemed to accrue at the time of the occurrence of the last act of the defendant giving rise to the cause of action: Provided that whenever there is bodily injury to the person, economic or monetary loss, or a defect in or damage to property which originates under circumstances making the injury, loss, defect or damage not readily apparent to the claimant at the time of its origin, and the injury, loss, defect or damage is discovered or should reasonably be discovered by the claimant two or more years after the occurrence of the last act of the defendant giving rise to the cause of action, suit must be commenced within one year from the date discovery is made: Provided nothing herein shall be construed to reduce the statute of limitation in any such case below three years. Provided further, that in no event shall an action be commenced more than four years from the last act of the defendant giving rise to the cause of action ....

N.C. Gen.Stat. § 1–15(c). Thus, the normal point at which the statute accrues is "at the time of the occurrence of the last act of the defendant giving rise to the cause of action," and then runs for not less than three years. *Id.* However, there is an alternate period of limitations based on the claimant's "discovery" of their loss. This period takes effect when there is a "bodily injury to the person, [an] economic or monetary loss, or a defect in or damage to property," which is "not readily apparent to the claimant at the time of its origin," and such injury, loss, defect, or damage is subsequently "discovered or should reasonably be discovered by the claimant two or more years after the occurrence of the last act of the defendant giving rise to the cause of action." *Id.* In this situation, "suit must be commenced within one year from the date discovery is made ...." *Id.* In other words, the statute normally runs for three years from when the last act that gave rise to the cause of action occurred, unless two or more years have passed since the last act occurred and the other requirements of the "discovery" provision apply, in which case the plaintiff then has one year from the date he discovered his injury, loss, defect or damage to bring suit.[9]

Although DDG's alleged loss is economic or monetary in nature, the "discovery" portion of the statute does not help DDG because it discovered the loss less than two years after the last act of Little and Smith Helms. That is, DDG's "discovery" occurred on May 3, 2000 when, after terminating its contract with Centech on March 22, 2000, it turned to Cincinnati for recourse against the performance bond and Cincinnati denied payment on the bond. Accordingly, DDG's claims against Little and Smith Helms are subject to the ordinary three year statute of limitations which begins to run at the time of the occurrence of the last act of Little and Smith Helms that gave rise to the cause of action. Thus, the Court must determine when this "last act" occurred.

DDG contends that the statute of limitations period could not accrue until Centech defaulted, which was a condition precedent to DDG being able to make a claim against Cincinnati and accrual of the statute of limitations. This argument is

---

**9.** It should, however, be noted that the "discovery" portion of the statute is not infinitely available to Plaintiffs; it is limited by a further directive of the statute which states that "in no event shall an action be commenced more than four years from the last act of the defendant giving rise to the cause of action ...." N.C. Gen.Stat. § 1–15(c).

misplaced because it asserts that the limitations period cannot accrue until some action is taken by a third party, Centech, rather than from the actual last act of Little and Smith Helms who are the "defendants" in the crossclaims asserted by DDG. Thus, the argument runs contrary to the plain language of the statute which provides that claims accrue "at the time of the occurrence of the last act of the *defendant.*" N.C. Gen.Stat. § 1–15(c) (emphasis added). Like the plaintiff in *Thorpe v. DeMent,* DDG's "argument depends upon the conclusion that [its] loss could not have occurred, and thus could not have been discovered, until [its] damages were made clear to [it] ...." *Thorpe v. DeMent,* 69 N.C.App. 355, 360, 317 S.E.2d 692, 695, *aff'd.,* 312 N.C. 488, 322 S.E.2d 777 (1984). This argument is flawed because, like the plaintiff in *Thorpe,* DDG "confuses the *fact* of loss with the *extent* of that loss." *Id.* As the *Thorpe* court explained, the " 'loss' or the invasion of a legally protected right of the plaintiff's, occurs when the negligence occurs," and thus "a cause of action for negligent injury accrues when the wrong giving rise to the right to sue is committed, even though the damages at that time are nominal." *Id.*

 Under the facts of this case, the Court finds that the last act of "defendants" occurred on the date of closing, February 22, 1999, when Little delivered the bonds to BB & T's counsel. It was at this time that DDG suffered an invasion of a legally protected right, that is, the closing of the loan with the use of allegedly

invalid bonds. The fact that Centech later defaulted was not determinative of whether DDG had any rights under the bonds that had been provided to DDG by Massey and Centech. DDG's rights under the bonds, if any, were determined at the time of the loan closing on February 22, 1999. Because DDG's crossclaims against Little and its Third–Party Complaint against Smith Helms were not filed until August 8, 2002, well over three years after the February 22, 1999 closing, DDG's claims against Little and Smith Helms are time-barred. Accordingly, the Court will GRANT the Little and Smith Helms Motion for Summary Judgment [Document # 143] with respect to all claims levied against them by DDG because Defendants are entitled to judgment as a matter of law on the basis that DDG's claims are time-barred.[10]

 The Court will now analyze Little and Smith Helms' statute of limitations arguments as they relate to Cincinnati. In addition to a professional malpractice claim, Cincinnati has also asserted a breach of contract claim under a third-party-beneficiary theory against Little and a negligent misrepresentation against Little as well. Turning first to the professional malpractice claim, Cincinnati asserts, like DDG, that it was only after third-party subcontractors began to make claims under the bonds that Cincinnati was exposed to an actual loss. For the reasons stated above, the Court has determined that this argument is misplaced in that February 22, 1999[11] is the date of accrual

10. DDG's additional contention that the continuous representation doctrine should be applied is without merit because North Carolina has not adopted that doctrine for legal malpractice claims. *Fender v. Deaton,* 153 N.C.App. 187, 189 n. 1, 571 S.E.2d 1, 2 n. 1 (2002).

11. It is worth noting that February 22, 1999 was the scheduled, and actual, closing date of the loan. Any contention that the loan did

not close until March 16, 1999, when Little forwarded the Dual Obligee Rider to BB & T's attorney, Lambert, cannot be sustained for two reasons. First, the Dual Obligee Rider existed for the protection of BB & T which has made no claim against Cincinnati on that rider; thus, Cincinnati has no loss as a result of that instrument. Second, since the Dual Obligee Rider was a part of the earlier bonds, their alleged invalidity deprived DDG and BB

**686**

of the applicable statute of limitations for any cause of action Plaintiffs could have asserted against Little and Smith Helms. Accordingly, the only question for the Court to resolve is to determine when the three-year statute tolled. Of particular relevance here, the North Carolina Supreme Court has stated that "[t]he timely filing of [a] motion to amend, if later allowed, is sufficient to start the action within the period of limitations." *Mauney v. Morris,* 316 N.C. 67, 71–72, 340 S.E.2d 397, 400 (1986). Here, Cincinnati filed its Motion to Amend requesting leave to file the FAC on February 28, 2002, and thus tolled the statute on that date. Nevertheless, that date is still outside the three-year deadline to which Plaintiffs are strictly required to adhere. Therefore, Cincinnati's professional malpractice claim against Little and Smith Helms is time barred by the three-year statute of limitations. Cincinnati's third-party-beneficiary breach of contract claim and its negligent misrepresentation claim are likewise barred because they too are governed by three-year statute of limitations which, in this case, accrued on February 22, 1999 but were not tolled until February 28, 2002. *See* N.C. Gen.Stat. § 1–52(1) (breach of contract); N.C. Gen.Stat. § 1–52(5) (negligent misrepresentation). Accordingly, the Court will grant Little and Smith Helms' Motion for Summary Judgment [Document # 143] with respect to all claims levied against them by Cincinnati because Little and Smith Helms are entitled to judgment as a matter of law because Plaintiffs' claims against them are time-barred.

& T of the ability to obtain a valid rider at least no later than the February 22, 1999,

**D. Motion to Amend Pleadings [Document # 115]**

Motion to Substitute Amended Pleading [Document # 135]

On December 9, 2002, Plaintiffs filed a Motion to Amend Pleadings which seeks to amend two different pleadings. First, the Motion to Amend Pleadings seeks to amend the First Amended Complaint by filing a Second Amended Complaint. Second, the Motion seeks to amend Plaintiffs' Reply to the Counterclaim of Dynamic Development Group, LLC and Counterclaim Against Dynamic Development Group. A companion motion to the Motion to Amend Pleadings is Plaintiffs' Motion to Substitute Amended Pleading, which was filed on February 10, 2003. This second Motion to Amend by Plaintiffs asks the Court to allow Plaintiffs to file a Substituted Second Amended Complaint in place of the Second Amended Complaint that was earlier filed with the Plaintiffs' initial Motion to Amend Pleadings.

The Court will first address the Plaintiffs' request in the initial Motion to Amend Pleadings to amend the First Amended Complaint by filing a Second Amended Complaint. The proposed Second Amended Complaint seeks to add two new counts. In Count VIII, Plaintiffs seek to allege that the conduct of attorneys Little and Lambert amounts to a violation of the North Carolina antiracketeering statute. In Count IX, Plaintiffs seek to allege that Smith Helms is liable to Cincinnati for failure to properly supervise Little. Additionally, the Second Amended Complaint seeks to add claims for special damages against Lambert, Little, and BB & T wherein Plaintiffs desire damages "including but not limited to [their] fees and

closing date.

costs in the prosecution of this Declaratory Judgment action, and in the defense of the claims brought against [them] by DDG, BBT [sic] and others to enforce the bonds, and to defend against other claims made by these parties against Cincinnati." (Second Am. Compl. ¶¶ 17, 22, 27.)

The Court will deny Plaintiffs' request to file a Second Amended Complaint as being moot in light of Plaintiffs' subsequent request instead to file the Substituted Second Amended Complaint. The Court specifically notes that this denial negates Plaintiffs' request to add antiracketeering allegations against Lambert and Little because these allegations are absent from the Substituted Second Amended Complaint. In all other regards, the Substituted Second Amended Complaint is identical to the Second Amended Complaint but without a reference to antiracketeering allegations against Lambert and Little.

■ Turning to the actual request to file the Substituted Second Amended Complaint, the Court will allow Plaintiffs to file the Substituted Second Amended Complaint, subject to certain obvious limitations. First, in light of the ruling discussed above, whereby the Court granted summary judgment in favor of attorney Little, the Court will deny Plaintiffs' request to add a negligent supervision claim against Smith Helms because such a claim is dependent on Plaintiffs' claim against Little which the Court has dismissed. As for the special damages requested in the Substituted Second Amended Complaint, for the reasons stated, the Court will likewise deny Plaintiffs' request to add special damages against attorneys Lambert and Little.[12]

The Court will now turn to the second portion of Plaintiffs' Motion to Amend. Here, Plaintiffs seek to amend their Reply to the Counterclaim of Dynamic Development Group, LLC and their Counterclaim Against Dynamic Development Group. Specifically, Cincinnati seeks to add three counts to its Reply to DDG's counterclaim, namely Count I, so as to allege that the acts of DDG fall within the reach of the North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen.Stat. § 75–1.1 *et seq.;* Count II, that the acts of DDG in filing a bad faith claim against Cincinnati constitute an abuse of process; and Count III, that DDG is liable for the actions of its attorneys under a respondeat superior theory or a principal-agent theory. The entirety of this request has been uncontested by DDG; however, the Court will only grant the request in part. The Court will allow the request as to Count I and Count II, but the Court will deny Plaintiffs' request to add Count III because of the Court's earlier ruling granting Little's Motion for Summary Judgment with respect to Plaintiffs' claims against her.

To summarize, the Court's resolution of these matters has resulted in the Court granting Plaintiffs' Motion to Substitute Amended Pleading [Document # 135], thereby allowing the Substituted Second Amended Complaint to serve as the relevant document for purposes of the Motion to Amend Pleadings [Document # 115]. The Court then further granted Plaintiffs' Motion to Amend Pleadings, in part, by striking certain portions of the Substituted Second Amended Complaint. Specifically, the Court has denied Plaintiffs' request to add a negligent supervision claim against Smith Helms, and Plaintiffs' requests for special damages against attorneys Lam-

---

**12.** Given the Court's later ruling with respect to BB & T's Motion for Summary Judgment as to the claim asserted against it by Plain- tiffs, the Court will also deny Plaintiffs' motion to amend the pleadings to add a claim of special damages against BB & T.

bert, Little, and BB & T. Finally, for the reasons stated, the Court has denied Plaintiffs' request to add Count III to their counterclaim against DDG, which would have asserted that DDG is liable for the actions of its attorneys under a respondeat superior theory or a principal-agent theory.

E. Plaintiffs' Motion for Summary Judgment of the Counterclaims of Dynamic Development Group, LLC and BB & T Bank of South Carolina [Document # 136]

■■■ In this Motion, Plaintiffs seek summary judgment as to two [13] of the four counterclaims brought against it by DDG, namely, the alleged violations of the North Carolina UDTPA and DDG's counterclaim of common law bad faith.[14] Both of these claims are in the case pursuant to the Court allowing Plaintiffs to file a Substituted Second Amended Complaint. DDG's UDTPA counterclaim is based on a series

of acts which DDG contends Cincinnati committed "in violation of Chapter 58 of the North Carolina General Statutes." (Motions, Answer, Counterclaims, and Crossclaims of DDG ¶ 75.) Essentially, DDG alleges that these "acts and/or willful omissions of plaintiffs constitute unfair and deceptive trade practices within the meaning of N.C.G.S. § 75–1.1 *et seq.*" (*Id.* ¶ 76.) In addition, DDG's newly amended claim of common law bad faith hinges on the assertion that "Cincinnati breached its implied obligation of good faith and fair dealing . . . ." (*Id.* ¶ 67.) The central issue that dictates, as a matter of law, that summary judgment must be granted against both of these claims is because there is a distinction between the laws that govern surety contracts and those that govern insurance contracts.

As the parties seem to recognize, based on the relative lack of North Carolina cases cited in their briefs, there is not an abundance of North Carolina case law gov-

---

13. DDG has also alleged counterclaims against Plaintiffs for enforcement of the performance bond and for negligent misrepresentation. However, Plaintiffs' Motion for Summary Judgment is not directed towards these two counterclaims, which remain at issue in the case.

14. Although Plaintiffs' Motion for Summary Judgment purports to be directed at counterclaims raised by *both* DDG and BB & T, it appears that only DDG has brought counterclaims against Plaintiffs. Plaintiffs assert that "DDG . . . brought a claim against Cincinnati for bad faith, and for violation of NCGS § 58–63–15, and NCGS [§ ] 75–1.1. BB & T brought the same claims against Cincinnati by incorporation [sic] by reference DDG's counterclaim allegations." (Cincinnati's Mem. in Supp. of its Mot. for Summ. J. on the Counterclaims of DDG and BB & T at 6.) However, Plaintiffs provide no citation as to which of BB & T's pleadings allegedly incorporates by reference DDG's counterclaim allegations, and the Court's review of the filings in this case has not revealed any such pleading.

It is possible that Plaintiffs are referring to Document # 23, which was BB & T's original Answer to the original Complaint in which BB & T moved for a change of venue for reasons "more fully set forth in that separate Motion for Change of Venue and Brief in Support filed on behalf of Defendant Dynamic Development Group, LLC, which is adopted and incorporated herein by reference pursuant to F.R.Civ.Pro. [sic] Rule 10(c)." (Mots. and Answer of BB & T at 2.) However, Document # 23 was stricken from the record for failure to comply with the formatting requirements of Local Rule 7.3(a). Its replacement is Document # 28, BB & T's subsequent Answer, which no longer contains the language of Document # 23 that attempted to incorporate DDG's change of venue argument, nor does it contain any language incorporating any allegation, counterclaim, or portion thereof made by DDG.

Nevertheless, to whatever extent BB & T may have incorporated the three DDG counterclaims discussed in this section, the Court's grant of summary judgment in favor of Cincinnati on these three claims will apply to BB & T as well as to DDG.

erning the issues raised by DDG's UDTPA and bad faith claims. There is, however, at least one North Carolina Court of Appeals case, *Henry Angelo & Sons, Inc. v. Prop. Dev. Corp.*, 63 N.C.App. 569, 306 S.E.2d 162 (1983), which both parties acknowledge speaks to the issue. While both parties also cite to several state cases from other jurisdictions to lend persuasive support to their respective positions, *Angelo* is the controlling North Carolina law in this diversity action.

The heart of DDG's argument is that "[t]here can be no dispute that insurance is not identical to suretyship in every respect and there are certain differences as to form and the obligations of the parties. However, the general relationship between the parties is not so fundamentally different that a bad faith claim could exist for insurance but not for bond claims." (DDG's Mem. in Opp'n to Cincinnati's Mot. for Partial Summ. J. on DDG's Counterclaims at 10.) In *Angelo*, the court clearly explained that "[i]n the law, insurance and suretyship are not synonymous terms, and if any appellate court anywhere has ever so held, our research has failed to disclose it." *Angelo*, 63 N.C.App. at 574, 306 S.E.2d at 165. Beyond just "certain differences as to form and the obligations of the parties," as DDG contends, *Angelo* makes clear that insurance contracts and suretyship contracts "involve different functions, relationships, rights and obligations; and have been recognized and treated by the

profession as distinctive fields of law for generations." *Id.* Specifically, *Angelo* defined an insurance contract as " 'an agreement by which the insurer is bound to pay money or its equivalent or to do some act of value to the insured upon, and as an indemnity or reimbursement for the destruction, loss, or injury of something in which the other party has an interest.' " *Id.* at 574, 306 S.E.2d at 166 (quoting current N.C. Gen.Stat. § 58–1–10). The *Angelo* case then defined a suretyship contract as " '[a] lending of credit to aid a principal having insufficient credit of his own; the one expected to pay, having the primary obligation, being the principal, and the one bound to pay, if the principal does not, being the surety.' " *Id.* (quoting Black's Law Dictionary 1611 (rev. 4th ed.1968)) (some internal quotation marks omitted). Thus, there can be no question that there are fundamental differences between suretyship and insurance.[15]

The differences are made clearer by the fact that "[t]he statutory provisions that control and regulate insurance in [North Carolina] are contained in Chapter 58 of the General Statutes entitled 'Insurance;' those that regulate suretyship in Chapter 26 entitled 'Suretyship.' " *Id.* There is no doubt that DDG premised its UDTPA claim against Cincinnati on the basis of acts that Cincinnati allegedly committed "in violation of Chapter 58 of the North Carolina General Statutes."[16] (Mo-

---

**15.** DDG's assertion that North Carolina case law decided prior to *Angelo* "clearly recognized the similarities of insurance and suretyship," provides no benefit to DDG. (*See* DDG's Mem. in Opp'n to Cincinnati's Mot. for Partial Summ. J. on DDG's Counterclaims at 10.) The two cases that DDG refers to are *Guilford Lumber Mfg. v. Johnson*, 177 N.C. 44, 97 S.E. 732 (1919), and *Maxwell v. S. Fid. Mut. Ins. Co.*, 217 N.C. 762, 9 S.E.2d 428 (1940). The *Angelo* decision does not conflict with the general notion, expressed in *Guilford* and *Maxwell*, that there are indeed similari-

ties between insurance and suretyship. Moreover, *Angelo* discusses both *Guilford* and *Maxwell* and points out that the mere fact that those cases mention similarities between suretyship and insurance "no more justifies the conclusion that sureties are insurers and performance bonds are contracts of insurance than does the commonly known fact that sheep are somewhat like goats justify the conclusion that sheep are goats." *Angelo*, 63 N.C.App. at 578, 306 S.E.2d at 168.

**16.** Specifically, the factual allegations of DDG's counterclaim, contained in paragraph

tions, Answer, Counterclaims, and Cross-claims of DDG ¶ 75.) There is, however, no dispute in this litigation that Cincinnati's role in the loan closing, if any, was that of a surety, not an insurer. Thus, as *Angelo* makes apparent, DDG cannot lodge a UDTPA claim against Cincinnati that is founded on alleged violations of North Carolina's insurance laws as set out in Chapter 58 of the North Carolina General Statutes. Accordingly, the Court will grant Cincinnati's Motion for Summary Judgment [Document # 136] as to DDG's UDTPA counterclaim.[17]

■ As for DDG's common law counterclaim of bad faith, the Court finds that summary judgment is appropriate against this counterclaim as well. Here again the distinction between suretyship and insurance is fatal to the claim. The duty of good faith and fair dealing required to sustain a common law bad faith claim is a concept of insurance law and attaches because of the special relationship between insureds and insurers.

■ The fact that both parties have cited only authority from other state jurisdictions indicates that North Carolina courts have not spoken to the issue of whether an obligee may assert a bad faith cause of action against a surety. Indeed, DDG candidly states that "there does not appear to be any precedent in North Carolina directly addressing" the issue. (*See*

DDG's Mem. in Opp'n to Cincinnati's Mot. for Partial Summ. J. on DDG's Counter-claims at 3.) Because this is indeed an issue on which the North Carolina courts have not spoken, it is not within the province of this Court to rely on "policy reasons" to "extend[ ] . . . bad faith claims to surety relationships," as DDG requests. (*See* DDG's Mem. in Opp'n to Cincinnati's Mot. for Partial Summ. J. on DDG's Counterclaims, at 8.)

■ Therefore, this Court will follow the less expansive reading of the law on this issue, so as not to create rights in North Carolina which this State's courts might not otherwise choose to recognize. The Texas Supreme Court's decision in *Great American Insurance Co. v. North Austin Municipal Utility District No. 1,* 908 S.W.2d 415 (Tex.1995), is representative of those jurisdictions that adhere to a less expansive approach in this area; moreover, its analysis is logical and persuasive. As the Texas Supreme Court summarized in a later case, "[t]he issue in *Great American* was whether a bond surety owes a common law duty of good faith to the *obligee.* In holding that no such duty exists, we reaffirmed that not every contractual relationship gives rise to a duty of good faith." *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 280 (Tex.1998). "Instead, the

---

75, appear to be phrased so as to fall within the ambit of North Carolina General Statutes section 58–63–15, which is the section of Chapter 58 that deals with unfair methods of competition and unfair or deceptive acts.

17. In so doing, the Court is mindful of the fact that in North Carolina "the remedy for a violation of section 58–63–15 is the filing of a section 75–1.1 claim. There is no requirement, however, that a party bringing a claim for unfair or deceptive trade practices against an insurance company allege a violation of section 58–63–15 in order to bring a claim pursuant to section 75–1.1." *Country Club of*

*Johnston County, Inc. v. United States Fid. and Guar. Co.,* 150 N.C.App. 231, 244, 563 S.E.2d 269, 278 (2002) (internal quotations omitted) (emphasis omitted). In this instance, however, except for attempting to impute the action of Massey to Plaintiffs, DDG has provided no evidence, save for unsupported assertions in its response brief, that Cincinnati's actions, as opposed to those of Massey, were violative of section 75–1.1 in some way other than the alleged Chapter 58 violations. The Court's grant of summary judgment is therefore effective against any and all alleged violations of North Carolina General Statutes section 75–1.1 that DDG has asserted against Cincinnati.

[Texas Supreme] Court has imposed such a duty only for certain special relationships, such as that between an insurer and its insured." *Id.* (citing *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987)). The factors giving rise to this "special relationship" include: 1) "unequal bargaining power"; 2) "the nature of insurance contracts which [permits] unscrupulous insurers to take advantage of their insureds' misfortunes" in claim resolution; and 3) the insurer's exclusive control over the claim evaluation process. *Arnold*, 725 S.W.2d at 167. This Court concludes, as the Texas Supreme Court has, that "because these factors are not present in the relationship between surety and obligee, the duty of good faith and fair dealing should not apply." *Assoc. Indem. Corp.*, 964 S.W.2d at 280 (reiterating the holding of *Great American*). The Court further notes that the principles espoused by the North Carolina Court of Appeals in *Angelo*, regarding the fundamental differences in insurance and suretyship, heavily underscore this conclusion as well. Accordingly, the Court finds that an obligee may not assert a bad faith cause of action against a surety and will, therefore, grant Cincinnati's Motion for Summary Judgment [Document # 136] against DDG's counterclaim of common law bad faith.

### F. BB & T's Motion for Summary Judgment [Document # 133]

As previously noted in the Court's discussion of the statute of limitations argument raised by Little and Smith Helms as to Plaintiffs' claims against them, it was not until February 28, 2002, that Plaintiffs filed their motion to amend their original Complaint. Plaintiffs' FAC was actually filed on June 6, 2002. The only count of the Plaintiffs' FAC directed towards BB & T is Count III. In particular, the applicable portions of the FAC alleged that "BB & T, acting by and through its agents, representatives, employees and officers, failed to exercise reasonable care in the performance of loan closing transactions related to the Loan," and that "BB & T's breach of its duties, including any fiduciary obligation owed to DDG and Cincinnati, was a substantial factor in Massey providing fraudulent bonds on behalf of Centech to DDG." (FAC ¶¶ 22, 23.) Consequently, Plaintiffs assert that they are "entitled to indemnification and contribution from BB & T for any amounts it is required to pay as a result of BB & T's breach of its duties owed to DDG and subsequently to Cincinnati." (FAC ¶ 24.)

BB & T, through its attorney Donald G. Sparrow, filed a Motion for Summary Judgment on February 10, 2003, after its initial attorney Mullins ceased to represent BB & T. As a basis for its Motion for Summary Judgment, BB & T denies Plaintiffs' allegations and asserts that the new causes of action as identified above in Plaintiffs' FAC do not relate back to Plaintiffs' original Declaratory Judgment Action and therefore they are time barred by the appropriate federal and state statutes of limitations. In addition, BB & T also argues that there is a lack of law to support Plaintiffs' claims against BB & T because BB & T owed no duty to Plaintiffs which would make it liable to Plaintiffs if the bonds are held to be valid. To the extent that Plaintiffs' claims can be viewed as asserting a claim for negligence or negligent misrepresentation against BB & T, the statute of limitations for negligence in North Carolina is three years from the act giving rise to the cause of action. N.C. Gen.Stat. § 1–52(5). The Court has previously noted in Section C of this Memorandum Opinion that February 22, 1999, the date of the closing, is the date of accrual of the statute of limitations for any cause of action Plaintiffs would have been able to assert against BB & T. As previously noted, Cincinnati did not file its Motion to

Amend its original Complaint until February 28, 2002, which resulted in a tolling of the statute on that date. This date, however, was still outside the three-year statute of limitations for a negligence claim that accrued on February 22, 1999. The Court finds that Plaintiffs' claims against BB & T, as stated in its FAC, are therefore time-barred. For this reason, BB & T's Motion for Summary Judgment [Document # 133] is GRANTED.

■ Even if Plaintiffs' claims were not time-barred, BB & T, like Little and Smith Helms, *Brinkman* as supplemental authority in support of its Motion for Summary Judgment as to Plaintiffs' amended claim of negligent misrepresentation by BB & T. First, BB & T argues that *Brinkman* makes it clear that Plaintiffs have failed to state a claim upon which relief can be granted. (BB & T's Mot. to Cite Supp. Authority in Favor of Its Mot. for Summ. J. at 1.) BB & T asserts that Plaintiffs are claiming that BB & T, like the other Defendants Lambert and Little, should have seen that the bonds were fraudulent and disclosed this fact to Plaintiffs. (BB & T's Br. in Supp. of Mot. for Summ. J. at 4.) BB & T argues that paragraph 23 of Plaintiffs' FAC frames Plaintiffs' theory of BB & T's liability more clearly to the extent that it alleges that "BB & T's breach of its duties, including any fiduciary obligation owed to Cincinnati, was a substantial factor in Massey providing fraudulent bonds on behalf of Centech to DDG." (*Id.* at 5.) As an aside, BB & T notes that any action it may have taken was after the bonds were already executed so that BB & T's actions could not have been a substantial factor in Massey's fraudulent activity. (*Id.* at 5 n. 2) BB & T therefore argues that it cannot be liable to Plaintiffs under any negligence theory because Plaintiffs must first show that BB & T owed some duty to Plaintiffs and it breached that duty. (*Id.* at 10.) Given that the FAC does not allege that BB & T owed any duty of care to Plain-

tiffs, BB & T also acknowledges that the source of Plaintiffs' claim for negligent misrepresentation can only be section 552 of the Restatement (Second) of Torts. (*Id.* at 11.) As previously stated, the North Carolina Supreme Court in *Brinkman* held that justifiable reliance requires actual reliance. *Brinkman* 155 N.C.App. at 742, 575 S.E.2d at 43. BB & T argues, however, that "there is no allegation in the Amended Complaint that Defendant BB & T either knew or with the exercise of due care should have known that Plaintiffs expected an institutional lender to review its documents which had been fraudulently produced and delivered to an owner." (BB & T's Br. in Supp. of Mot. For Summ. J. at 11.) In essence, BB & T is arguing here that there are no allegations or evidence that Plaintiffs ever actually relied on any conduct of BB & T which would give rise to a duty owed by BB & T to Plaintiffs under a claim of negligent misrepresentation under section 552(1) of the Restatement (Second) of Torts. BB & T emphasizes this point by arguing that "[i]n fact Cincinnati admitted through its representative, Charles Armentrout, that it never relied on any representations made by BB & T." (BB & T's Mot. to Cite Supp. Authority in Favor of Its Mot. for Summ. J. at 2.) Based upon the holding of *Brinkman*, because there is no evidence that Plaintiffs actually relied upon information provided by or could have been provided by BB & T prior to the loan closing on February 22, 1999, the Court finds that BB & T would be entitled to summary judgment as to Plaintiffs' claim of negligent misrepresentation, even if Plaintiffs' claim against BB & T were not barred by the statute of limitations.

G. **Plaintiffs' Motion for Summary Judgment on Bond Validity [Document # 138]**

■ Plaintiffs' Motion for Summary Judgment on Bond Validity was filed on

February 10, 2003, and "seeks to have this court declare void ab initio, a fraudulent Performance Bond, and a Fraudulent ... Labor and Material Payment Bond, and a fraudulent Dual Obligee Rider, all of which were fabricated by a former agent of Cincinnati, William Massey ...." (Cincinnati's Mem. in Supp. of Its Mot. for Summ. J. on the Issue of Bond Validity at 1.) In particular, Plaintiffs argue that article 7.3 of the Construction Contract between DDG and Centech required the payment and performance bonds issued to Centech to "be accompanied by a power of attorney authorizing the attorney in fact to bind the surety certified to include the date of the bond." (*Id.* at 2.) Furthermore, Plaintiffs assert the bonds are invalid because Massey's fraudulent bonds did not use an original bond form, he did not attach a power of attorney to each bond as the Construction Contract required, he did not provide an original signature or a seal on the bonds, and finally that Massey never billed Centech for the bond premium. (Cincinnati's Mem. in Supp. of Its Mot. for Summ. J. on the Issue of Bond Validity at 6.) Cincinnati makes the same argument with respect to its claim as to the invalidity of the Dual Obligee Rider issued as part of the Construction Loan Agreement between DDG and BB & T. Plaintiffs argue that "[l]ike the Bonds, the bogus Dual Obligee Rider lacked essential information on the face of the document, and most importantly, it lacked a seal and a POA (power of attorney)." (*Id.* at 7.).

Because it is the entity most directly affected by the issues raised in Plaintiffs' Motion for Summary Judgment on the question of bond validity, DDG is the only Defendant to respond to this Motion.[18] Given the Court's ultimate view that there is a genuine issue of material fact here, it is enough to describe the crux of DDG's response, which is that "Cincinnati's conduct in its continued relationship and failure to fully sever its ties with Massey as its agent as well as its neglect in obtaining the indicia of authority to issue bonds dictates ... that there is an issue of fact as to who should bear the loss." (DDG's Mem. in Opp'n to Cincinnati's Mot. for Partial Summ. J. at 20.) In support of this contention DDG have cited case law which holds that "if the principal does not take appropriate affirmative steps to destroy the former agent's apparent authority and reasonable action to inform third parties, the principal may be held liable for an apparent agent's actions ...." *Johnson v. Nationwide Gen. Ins. Co.*, 971 F.Supp. 725, 731 (N.D.N.Y.1997) (internal quotations omitted). DDG also points out that "the principal cannot restrict his liability for acts of his agent within the scope of his apparent authority by limitations thereon of which the person dealing with the agent has no notice." *Morpul Research Corp. v. Westover Hardware, Inc.*, 263 N.C. 718, 140 S.E.2d 416 (1965).

Because there are genuine issues of material fact as to whether Plaintiffs negligently enabled Massey, either by failing to adequately retrieve his indicia of authority and/or by failing to inform third parties that his agency status was limited, to act with apparent authority when he issued the fraudulent bonds, the Court will DENY Plaintiffs' Motion for Summary

---

**18.** BB & T has not asserted any claims against Plaintiffs on the basis of the Dual Obligee Rider, which is the only grounds upon which Plaintiffs could possibly have owed any financial obligations to BB & T. As noted previously, BB & T acknowledged that it has no legally cognizable interest in the outcome of this action (Plaintiffs' original Declaratory Judgment Action) because it was made whole when the loan was paid in full. (BB & T's Mem. in Supp. of [First] Mot. for Summ. J. at 4.)

Judgment on Bond Validity [Document # 138].