**THE CINCINNATI INSURANCE COMPANY, the Cincinnati Casualty Company, and the Cincinnati Indemnity Company, Plaintiffs,**

v.

**DYNAMIC DEVELOPMENT GROUP, LLC., and BB & T Bank Of South Carolina, Defendants.**

Nos. 1:00CV00280, 1:00CV00281, 1:00CV00282, 1:00CV00283 and 1:00CV00284.

United States District Court, M.D. North Carolina.

Sept. 17, 2004.

554

Andrew Albert Vanore, III, Derek M. Crump, Brown Crump Vanore & Tierney, L.L.P., Raleigh, NC, Thomas E. Crafton, Timothy D. Martin, Crafton Martin Ogburn & Zipperle, PLLC, Louisville, KY, for Plaintiff.

Stephani Wilson Humrickhouse, Nicholls & Crampton, P.A., John Keating Wiles and Joseph Blount Cheshire, V., Cheshire Parker Schneider Bryan & Vitale, Andrew Albert Vanore, III, Brown Crump Vanore & Tierney, L.L.P., Raleigh, NC, Edmund L. Gaines, Homseley Jones Gaines & Fields, Statesville, NC, William Everett Moore, Jr., Gray Layton Drum Kersh Solomon Sigmon & Furr, P.A., Gastonia, NC, E. Wade Mullins, III, Henry P. Wall, Bruner Powell Robbins Wall & Mullins, LLC, Columbia, SC, Seth R. Cohen, Smith James Rowlett & Cohen, Greensboro, NC, John R. Buric, James McElroy & Diehl, P.A., Christian Riley Troy, Helms Cannon Hamel & Henderson, Charlotte, NC, for Defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

### I. INTRODUCTION

This matter is again before the Court on various post-trial motions filed by Plaintiff Cincinnati Insurance Co.[1] ("Cincinnati" or "Plaintiff"), Defendant Dynamic Development Group LLC ("DDG"), and Defendant BB & T Bank of South Carolina ("BB & T"). Cincinnati has four Motions before the Court: (1) Cincinnati's Objections to BB & T's Bill of Costs [Document # 233]; (2) Motion to Redesignate Objection to Bill of Costs as Motion to Disallow and Motion for Extension of Time the Same ("Motion to Redesignate and Extend") [Document # 237]; (3) Motion to Recover Attorney Fees Pursuant to Rule 54(d)(2) ("Motion for Attorneys' Fees") [Document # 244]; and (4) Motion to Recover Attorney Fees Pursuant to Rule 11 ("Rule 11 Motion") [Document # 246]. Cincinnati has also filed a Bill of Costs [Document # 236] to be taxed against DDG. DDG has filed two Motions: (1) Motion for New Trial or in the Alternative Judgment as a Matter of Law ("Motion for New Trial/JMOL") [Document # 227] and (2) Motion for Disallowance of Cincinnati's Bill of Cost ("DDG's Motion for Disallowance") [Document # 241]. BB & T has filed one Motion, a Motion to Strike Cincinnati's Filing Entitled "Cincinnati's Objection to BB & T's Bill of Costs" ("Motion to Strike") [Document # 234]. BB & T has also filed a Request for Taxing of Costs [Document # 231] to be taxed against Cincinnati.

### II. FACTUAL BACKGROUND

The Court fully discussed the facts surrounding this case in its October 2, 2003, Memorandum Opinion ("Summary Judgment Opinion") [Document # 210]. *Cincinnati Ins. Co. v. Centech Bldg. Corp.,* 286 F.Supp.2d 669 (M.D.N.C.2003). As such, the Court will only restate those facts relevant to a disposition of the Motions currently before the Court.[2]

---

1. The present Motions and Bill of Costs filed by Cincinnati appear to be only asserted by Cincinnati Insurance Company. Originally, however, Cincinnati Insurance Company, Cincinnati Casualty Company, and Cincinnati Indemnity Company were all part of this case. To the extent that any of the current Motions or Bills of Costs would apply to Cincinnati Casualty Company or Cincinnati Indemnity Company, the Court's Memorandum Opinion would apply equally to those entities, as well as Cincinnati Insurance Company.

2. The Court notes that parties other than Cincinnati, DDG, and BB & T were also originally part of this case. However, the only parties relevant to the Motions and Bills of Costs currently before the Court are Cincinnati, DDG, and BB & T.

This case arose from a large-scale construction project in which Performance and Payment Bonds and a Dual Obligee Rider, issued in connection with the loan for the project, were allegedly fraudulently created. On September 10, 1990, Cincinnati entered into an Agency Agreement with Massey & Associates, an independent insurance agency, and its president, William H. Massey ("Massey"), wherein it was agreed that Massey & Associates and Massey would act as sales agents for Cincinnati. Some years later, on August 25, 1995, Massey was given a Letter of Authority for use with Power of Attorney from Cincinnati. This document, for the first time, conferred authority on Massey to execute surety bonds on behalf of Cincinnati. The Letter of Authority was sent to the Massey Agency along with a "bond kit" which contained, among other things, an embossed Cincinnati seal, bond forms, Cincinnati wafer seals, and powers of attorney ("POAs") naming Massey, and others in his agency, as Cincinnati attorneys-in-fact for the purpose of executing authorized Cincinnati surety bonds if the bonds fell within the $1,600,000 authority expressly set forth in the POAs. Massey and the authorized employees of the Massey Agency were not authorized to use the POAs for the purpose of executing Cincinnati contract bonds, including Performance and Payment bonds such as the ones at issue in this case, unless and until they received prior written approval from Cincinnati.

On October 4, 1996, Cincinnati terminated its Agency Agreement with Massey & Associates by letter and thereby revoked Massey's ability to execute any new bonds on behalf of Cincinnati. On October 7, 1996, Daniel T. McCurdy, Senior Vice President and Bond Manager for Cincinnati, wrote Massey directing him to destroy all Cincinnati powers of attorney previously provided to him and Massey & Associates by Cincinnati. Cincinnati also directed Massey to return all the other materials used to execute bonds, that is, the Cincinnati bond forms, the embossed seal, and the wafer seals. Two days later, Massey, on behalf of Massey & Associates, signed a Limited Agency Agreement acknowledging that the Agency Agreement with Cincinnati had been terminated as of October 4, 1996, and that Massey would act as a limited agent for Cincinnati only for the purpose of servicing policies which were issued prior to the October 4, 1996, termination date. During the time span relevant to this action, Cincinnati never informed the general public nor the North Carolina Department of Insurance of the termination of Massey's producer capacity and the creation of the Limited Agency Agreement. Cincinnati, however, argues that none of the parties involved in the loan closing for the Sleep Inn Motel ever contacted the North Carolina Department of Insurance to determine if Massey or his agency were affiliated with Cincinnati.

A few months later, on January 15, 1997, Cincinnati's Bond Department received a memo from Massey, on behalf of Massey & Associates, wherein Massey represented to Cincinnati that he had destroyed all powers of attorney in accordance with Mr. McCurdy's letter of October 7, 1996. Nevertheless, sometime after the termination of the initial Agency Agreement with Massey, Cincinnati instructed a field representative to go to the Massey Agency to physically retrieve the "bond kit" supplies. The field representative reported back to Cincinnati headquarters that he could not pick up the materials because he believed that Massey's wife kept a gun in her purse and that she harbored resentment against Cincinnati; the representative therefore feared for his personal safety if he were to go to the Massey Agency. Thus, there remained some concern at Cincinnati that Massey still had bond materials, but Cincinnati took no additional action to retrieve the bond materials.

In January 1999, Dynamic Development Group, LLC entered into a construction contract with Centech Building Corporation ("Centech") in the amount of $2,600,000 for the construction of a Sleep Inn Motel at Interstate 77 and Highway 150 in Iredell County, North Carolina (hereinafter the "Sleep Inn Project"). DDG obtained financing for this construction through Defendant BB & T. In the past, Centech, the general contractor for the Sleep Inn Project, had obtained most of its insurance and bond needs from the Massey Agency. During the duration of the business relationship between the Massey Agency and Centech, the Massey Agency obtained performance and payment bonds through Travelers Insurance Company, Amwest Surety, and other commercial sureties, but never through Cincinnati. At the time of the Sleep Inn Project, Centech was having financial problems and, consequently, its primary surety at the time, Travelers, refused to bond Centech for the Project. The Massey Agency was particularly motivated to obtain the bonds Centech needed for the Sleep Inn Project because Centech needed the money to pay the Massey Agency $30,000 in premiums it owed for such things as workers' compensation and general liability coverage. To prevent Centech from losing the Sleep Inn Project contract while Massey attempted to obtain legitimate bonds from Amwest Surety, Massey decided to "manufacture" a fraudulent payment bond, a fraudulent labor and performance bond, and a fraudulent Dual Obligee Rider to make it appear that Centech had met the requirements of the contract.

According to Massey, when he manufactured the fake bonds he copied a previously executed Cincinnati performance bond and a previously executed labor and material payment bond. Massey modified the bond by whiting-out the blanks on an old bond, and then inserted the necessary information on a photocopied form. As for the Dual Obligee Rider, Massey indicated that he did not have a standard dual-obligee-rider form because those forms had not been included in his original "bond kit" from Cincinnati; therefore, he used a Cincinnati indemnity-type performance bond provided to him, and manually typed "Dual Obligee Rider" at the top left of the bond form. Massey's "manufactured" bonds lacked an original agent's signature, did not have the proper embossed seal or wafer seal, and did not have a power of attorney attached.

Not long after the Sleep Inn Project started, Centech was unable to keep up with the project schedule, and subcontractors and vendors began calling requesting information regarding the bonds in order to file payment bond claims. Cincinnati alleged that it was only when it began to receive claims from some of the subcontractors and/or vendors for the Sleep Inn Project that it began to discover that something was wrong. Subsequently, Cincinnati searched its files but could not find any record of issuing bonds for the Sleep Inn Project, or for Centech. Further investigation revealed that Massey had issued fraudulent Cincinnati bonds for approximately $9,000,000, including those issued in connection with this litigation.

### III. PROCEDURAL HISTORY

On March 21, 2000, Cincinnati filed its original Complaint, entitled Complaint for Declaratory Judgment [Document # 1]. Cincinnati filed this Complaint against DDG (as well as other parties not relevant to the present Motions before the Court), seeking a "Declaratory Judgment declaring that Cincinnati has no liability under the Bond and same is void *ab initio*." On June 6, 2002, Cincinnati filed its First Amended Complaint ("FAC") [Document # 77], which added a claim against BB & T (as well as claims against other parties not

relevant to the present Motions before the Court) alleging that "BB & T, acting by and through its agents, representatives, employees and officers, failed to exercise reasonable care in the performance of loan closing transactions related to the Loan," and that "BB & T's breach of its duties, including any fiduciary obligation owed to DDG and Cincinnati, was a substantial factor in Massey providing fraudulent bonds on behalf of Centech to DDG." (FAC ¶¶ 22, 23.) Consequently, Cincinnati asserted that it was "entitled to indemnification and contribution from BB & T for any amounts it [was] required to pay as a result of BB & T's breach of its duties owed to DDG and subsequently to Cincinnati." (*Id.* ¶ 24.)

In response to Cincinnati's Declaratory Judgment action, DDG asserted four counterclaims against Cincinnati: (1) violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"); (2) common law bad faith; (3) enforcement of the performance bond; and (4) negligent misrepresentation.

After the various parties filed Motions for Summary Judgment, this Court issued its Summary Judgment Opinion on October 2, 2003. With respect to Cincinnati's claims against BB & T, which Cincinnati first asserted in its FAC, the Court granted BB & T's Motion for Summary Judgment for two reasons. First, the Court found that Cincinnati's causes of action against BB & T were barred by the statute of limitations. *Cincinnati Ins. Co.*, 286 F.Supp.2d at 691–92. Second, the Court found that to the extent that Cincinnati asserted a claim for negligent misrepresentation against BB & T, the North Carolina Court of Appeals decision in *Brinkman v. Barrett Kays & Associates*, 155 N.C.App. 738, 575 S.E.2d 40 (2003), barred such a claim. *Cincinnati Ins. Co.*, 286 F.Supp.2d at 692.

With respect to DDG's counterclaims against Cincinnati, Cincinnati only moved for summary judgment as to DDG's counterclaims that Cincinnati violated the UDTPA and committed common law bad faith. The Court held that, in light of the North Carolina Court of Appeals decision in *Henry Angelo & Sons. Inc. v. Property Development Corp.*, 63 N.C.App. 569, 306 S.E.2d 162 (1983), DDG could not maintain a UDTPA claim against Cincinnati based upon alleged violations of North Carolina's insurance laws because the relationship between DDG and Cincinnati was one of suretyship, not insurance. *Cincinnati Ins. Co.*, 286 F.Supp.2d at 688–90. The Court further held that DDG could not maintain a bad faith claim against Cincinnati because "[t]he duty of good faith and fair dealing required to sustain a common law bad faith claim is a concept of insurance law and attaches because of the special relationship between insureds and insurers." *Id.* at 690.

With respect to Cincinnati's Motion for Summary Judgment on Bond Validity [Document # 138], the Court denied this Motion. The Court held that "there [were] genuine issues of material fact as to whether Plaintiffs negligently enabled Massey, either by failing to adequately retrieve his indicia of authority and/or by failing to inform third parties that his agency status was limited, to act with apparent authority when he issued the fraudulent bonds . . . ." *Cincinnati Ins. Co.*, 286 F.Supp.2d at 693.

Accordingly, the matter proceeded to trial on October 6, 2003. On October 9, 2003, Plaintiff filed a Motion to Amend to Conform to the Evidence, which this Court granted. (Partial Tr. of Jury Trial Proceedings ("Partial Tr.") [Doc. # 228] at 13.) Also on October 9, 2003, all evidence was concluded, closing arguments were made, and the jury was charged. After deliber-

ating that evening, the jury found that Massey fraudulently issued the Performance and Payment Bonds and the Dual Obligee Rider and that Massey did not have apparent authority to issue the bonds. Thus, the jury found that Cincinnati was not liable to DDG for the fraudulently issued bonds. On October 16, 2003, the Court entered a Judgment upon Jury Verdict [Document # 225] dismissing the case with prejudice.

A flurry of post-trial motions and requests for costs then ensued. On October 22, 2003, DDG filed its Motion for New Trial/JMOL. On November 21, 2003, BB & T filed a Bill of Costs to be taxed against Cincinnati. On December 8, 2003, Cincinnati filed its Objections to BB & T's Bill of Costs. On December 10, 2003, BB & T filed its Motion to Strike Cincinnati's Objections to BB & T's Bill of Costs. On December 16, 2003, Cincinnati filed its Bill of Costs requesting that costs be taxed against DDG. On December 22, 2003, Cincinnati filed its Motion to Redesignate and Extend. On January 15, 2004, DDG filed its Motion for Disallowance in objection to Cincinnati's Bill of Costs. On February 18, 2004, Cincinnati filed its Motion for Attorneys' Fees and its Rule 11 Motion, both against DDG. Finally, DDG filed a Motion for Extension of Time ("Motion to Extend") [Document # 248] to respond to Cincinnati's Motion for Attorneys' Fees and Rule 11 Motion. This Court granted DDG's Motion to Extend by Order dated March 19, 2004. The time for response and reply briefs having passed, all of these matters are ripe for adjudication.

The Court will address these various Motions and Bills of Costs as follows: First, the Court first address DDG's Motion for New Trial/JMOL. Second, the Court will discuss Cincinnati's Motion for Attorneys' Fees and Rule 11 Motion filed against DDG. Third, the Court will discuss BB & T's Bill of Costs to be taxed against Cincinnati, Cincinnati's Objections to BB & T's Bill of Costs, BB & T's Motion to Strike, and Cincinnati's Motion to Redesignate and Extend. Fourth, the Court will Discuss Cincinnati's Bill of Costs to be taxed against DDG and DDG's Motion to Disallow Cincinnati's Bill of Costs.

## IV. DDG'S MOTION FOR NEW TRIAL/JMOL

In DDG's Motion for New Trial/JMOL, DDG is renewing its request for judgment as a matter of law (which DDG previously requested at the close of all the evidence) pursuant to Federal Rule of Civil Procedure 50(b).[3] Alternatively, DDG is moving pursuant to Rule 50(b) and Rule 59 for a new trial. The Court will discuss DDG's alternative motions in turn.

### A. Motion for Judgment as a Matter of Law

■ Judgment as a matter of law may be granted against a party "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue . . . ." Fed.R.Civ.P. 50(a)(1). In its renewed Motion for JMOL, DDG "contends it should be entitled to judgment as a matter of law based upon the evidence because Cincinnati did not meet its burden of proof on the issue of apparent authority and the grounds previously stated in the record upon [DDG's] initial motion for judgment, [sic] as a matter of law." (DDG's Mem. Supp. Mot. New Trial/JMOL [Doc. # 227] at 7–8.) This Court previously considered DDG's Motion for JMOL at the close of all of the evidence. After carefully considering both parties'

---

3. The Court notes that there is no dispute that DDG's Motion for New Trial/JMOL is timely because it was filed within ten days of the entry of the Court's judgment.

arguments and the evidence before the jury, this Court denied Defendant's Motion. (Partial Tr. at 31.) In its renewed Motion for JMOL, DDG raises no new grounds in support of its contention that it is entitled to judgment as a matter of law. The Court therefore finds, as it did previously, that there was a legally sufficient evidentiary basis for a reasonable jury to find in favor of Cincinnati. Accordingly, DDG's Motion for JMOL is denied.

### B. Motion for New Trial

■ In the alternative to its Motion for JMOL, DDG also contends that it is entitled to a new trial because this Court improperly submitted the issues to the jury. The Court notes that a new trial should be ordered when the verdict is against the clear weight of the evidence, is based on false evidence, or will result in a miscarriage of justice. *Atlas Food Sys. & Serv., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir.1996). The Court has broad discretion in considering motions for new trial. *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 500 (4th Cir. 2001). When considering such a motion, it may weigh evidence and consider the credibility of witnesses. *Conner v. Schrader–Bridgeport Int'l, Inc.*, 227 F.3d 179, 200 (4th Cir.2000).

■ Defendant does not contend that the jury's verdict was based on false evidence or that it contradicted the clear weight of the evidence. Instead, Defendant contends only that the Court improperly instructed the jury. As such, the Court should only grant a new trial "if the errors alleged by [Defendant] resulted in a miscarriage of justice." *Dawson v. Page*, 286 F.Supp.2d 617, 620, (M.D.N.C.2003) (citing *Atlas Food Sys.*, 99 F.3d at 594). The Court notes that it "has broad discretion in framing jury instructions, which should relate the law to the evidence presented by the parties." *Dawson*, 286

F.Supp.2d at 622 (citing *Teague v. Bakker*, 35 F.3d 978, 985 (4th Cir.1994); 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d*, § 2556 (1995)). So long as the instructions correctly state the law and adequately cover the legal issues, they are proper. *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1164 (4th Cir.1986). "Jury instructions are sufficient if 'construed as a whole, and in light of the whole record,' they 'adequately inform[ ] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party.'" *Dawson*, 286 F.Supp.2d at 622 (alteration in original) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir.1987)).

Specifically, DDG objects to three aspects of the Court's submission of issues to the jury: (1) the verdict sheet the Court used; (2) the Court's failure to specifically instruct the jury on the principles of equity; and (3) the Court's failure to charge the jury on the North Carolina insurance statutes. The Court will discuss Defendant's contentions in turn.

#### 1. Objections to the Verdict Sheet

DDG contends that the verdict sheet this Court presented to the jury failed to properly submit the issue of negligence to the jury. The Court presented the following verdict sheet to the jury:

1. Were the bonds fraudulently issued?

2. Was William Massey authorized under the doctrine of apparent authority to issue the bonds for Cincinnati?

3. What amount of damages, if any, is defendant Dynamic Development Group entitled to recover from plaintiff Cincinnati?

(J. Jury Verdict.)[Doc. # 222]

DDG argues, as it did during the jury charge conference, that the second ques-

tion should have been broken into two issues, as follows:

2.a. "whether or not agent Massey acted with apparent authority in issuing the bonds,"

2.b. "whether or not Cincinnati was negligent in the management, administration, supervision and attempted termination of its agent Massey."

(DDG's Mem. Supp. Mot. New Trial/JMOL at 2.) DDG contends that by failing to include a separate question to the jury on the issue of negligence, the Court failed to present all of the issues to the jury for consideration. In support of this contention, DDG argues that its "apparent authority claim, and its claim for negligence are separate and distinct causes of action. Each claim has distinct elements of proof." (*Id.* at 3.)

A careful review of the relevant portions of the trial transcript belies DDG's present contention that this Court erred in properly addressing Defendant's request at trial that the issue of negligence be put before the jury. Although DDG now contends that the doctrine of apparent authority is totally separate from the doctrine of negligence, that is not the argument DDG made at trial, as demonstrated by the following portions of the trial transcript, in which DDG's attorney, Mr. Wall, argued as follows:

Mr. Wall: I think that there are two interrelated issues here, and I think we can go to the jury on two alternate theories of recovery, one being a contractual basis of recovery, that is that they had apparent authority, Mr. Massey had apparent authority to bind Cincinnati Insurance Company to liability under the bond, that would be a contractual case of apparent authority.

The other aspect of apparent authority would be a negligent aspect of apparent authority, that is, the principal is liable for the acts its agent committed within the scope of its apparent authority in tort, not saying that the bond is valid necessarily, but that they acted negligently and as a proximate cause of that negligence . . .

(Partial Tr. at 10–11.) As Mr. Wall later stated, "the whole concept of negligence is tied in with apparent authority." (*Id.* at 12.)

At trial, Mr. Wall engaged in the following colloquy with the Court with respect to his view of how the verdict sheet should be framed:

MR. WALL: Your Honor, we would propose that there are really three questions here, you know, one: Did Massey have apparent authority to issue the bond; yes or no? Did Cincinnati-if yes, go to number two, which number two is: Did Cincinnati breach its obligation under the bond? If no, go to number three; which is: Was Cincinnati negligent in its termination of Mr. Massey. And we think that really covers the whole umbrella.

THE COURT: That's all a part of the apparent authority [question]?

MR. WALL: It is.

(Partial Tr. at 20–21.)

DDG had three concerns at trial with respect to how the interrelated issues of apparent authority and negligence would be submitted to the jury: (1) that DDG would be limited to contractual, as opposed to tort, damages, (Partial Tr. at 22, 43–44, 61–62); (2) that the jury would not realize that after answering question one no, it should still proceed to question two, that is, if it found that the bonds were issued fraudulently (question one), it should still determine whether Massey had apparent authority to issue those bonds (question two), (Partial Tr. at 57–61); and (3) that by not putting the question of negligence in the verdict sheet, the jury would fail to answer the question of whether Cincinnati

was negligent in its termination of Massey. (Partial Tr. at 62–63.)

The Court addressed each of these concerns through the instructions it gave the jury. With respect to DDG's first concern, the Court specifically rejected Cincinnati's contention that its potential liability would be limited to a contractual recovery, and the Court instead instructed the jury on the damages available when a party has been negligent. With respect to DDG's second concern, the Court also instructed the jury on which questions to answer on the verdict sheet. There is no evidence before the Court that the jury did not realize its responsibility to answer question two independently of its answer to question one, and DDG makes no argument now that the jury was confused in this respect.

Finally, with respect to DDG's third concern, the Court specifically acknowledged this concern at trial. (Partial Tr. at 62.) The Court found it appropriate, however, to address this concern through its instructions to the jury, instead of unduly complicating the verdict sheet with additional questions. As even Mr. Wall acknowledged at trial, "a simple . . . verdict form is probably in everybody's best interest . . . ." (Partial Tr. at 19.) In this case, the Court believed that a separate negligence question to the jury would have been problematic for two primary reasons: (1) the issue of negligence, as DDG conceded, is interrelated with the issue of apparent authority, and (2) adding a separate negligence question would have required adding an additional question of whether DDG was contributorily negligent in relying on the bond fraudulently issued by Cincinnati.

In summary, therefore, the Court, through the use of its jury instructions and the verdict sheet, properly submitted all of the issues to the jury for full consideration. As the Court noted at trial, DDG framed its theory of recovery as follows: "whether or not the Plaintiffs were negligent in allowing Mr. Massey to be out there holding himself out with apparent authority . . . ." (Partial Tr. at 19.) DDG did not dispute this statement at trial as being an accurate statement of its theory of recovery, but it now contends that Cincinnati could have been liable under a theory of negligence wholly unrelated to the doctrine of apparent authority. Accordingly, the Court finds that the Court's decision not to include a separate question on the verdict sheet related solely to negligence did not result in a miscarriage of justice; in fact, the Court's presentation of the questions to the jury resulted in a simple, understandable verdict form that, combined with the Court's instructions to the jury, fully presented the interrelated issues of apparent authority and negligence to the jury. DDG's Motion for a New Trial on the basis that the verdict form was improper is therefore denied.

2. Objections to the Court's Refusal to Instruct the Jury on Principles of Equity

DDG further argues that the Court should have instructed the jury "that when one of two persons must suffer from the frauds of another, the party he [sic] who first reposed a confidence, or by his negligent conduct made it possible for the loss to occur, must bear the loss." (DDG's Mot. New Trial/JMOL at 6.) DDG contends that this instruction was necessary because it "is deeply embedded in the law of apparent authority in North Carolina when there is fraudulent conduct of putative agents and employees." (*Id.*) While Defendant's proposed instruction may in fact be an accurate statement of the law relating to apparent authority, as the Court informed DDG's counsel at trial, it did not believe it necessary for this statement to be specifically included in the

jury instructions. Rather, the Court found it appropriate to follow the North Carolina Pattern Jury Instructions on the doctrine of apparent authority.

The Court was further concerned that if it had included DDG's proposed instruction the jury could have been misled into believing that Cincinnati was strictly liable for any acts taken by Massey within the scope of his apparent authority, which is not the case because Cincinnati was only liable to the extent that DDG *reasonably* believed that Massey had authority to issue the bonds. As the North Carolina Supreme Court has consistently held, apparent authority is the "authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses; however, the determination of a principal's liability in any particular case must be determined by what authority the third person in the exercise of reasonable care was justified in believing that the principal had, under the circumstances, conferred upon his agent." *Zimmerman v. Hogg & Allen, P.A.*, 286 N.C. 24, 31, 209 S.E.2d 795, 799 (1974). The Court found that the pattern jury instructions accurately instructed the jury on the law of apparent authority, and for that reason the Court used the pattern instructions. DDG's Motion for New Trial/JMOL is therefore also denied with respect to DDG's contention that the Court's refusal to include an instruction on the principles of equity failed to correctly instruct the jury on the law of apparent authority.

3. Objections to the Court's Failure to Instruct the Jury About the Department of Insurance

DDG finally contends that the Court failed to charge the jury on the portion of the North Carolina Insurance statutes requiring insurance companies to "report, investigate and control the activities of corrupt agents." (DDG's Mot. New Trial/JMOL at 7.) DDG thus contends that this specific instruction was necessary to inform the jury that Cincinnati's failure to report Massey to the North Carolina Department of Insurance could be relevant as some evidence of Cincinnati's negligence. However, as this Court discussed at the charging conference, the Court typically does not discuss specific facts in its instructions but instead instructs the jury on the correct law to apply to the facts that the parties have presented. As the Court told Mr. Wall at the charging conference, "[y]ou can argue as to what you think the negligence is, based upon the evidence." (Partial Tr. at 51.)

DDG contends, however, that at an earlier sidebar in the case the Court had informed counsel for DDG that it would specifically charge the statute. (Def.'s Mot. New Trial/JMOL at 7.) DDG contends that this sidebar ensued while DDG was questioning a Ms. Theresa Knowles, an employee with the North Carolina Department of Insurance, about "the role of the Department in investigating corrupt agents and the statutory duties of insurance companies with respect to such agents." (*Id.*) DDG argues that Cincinnati objected to the questioning and, after hearing arguments from both sides, the Court informed DDG that it would charge the jury on the statute. DDG thus contends that it limited its questioning of the witness based upon "this expectation and understanding." (*Id.*)

The Court finds, however, that DDG apparently misunderstood the Court's ruling at this sidebar. What the Court stated at the sidebar was that it would only permit DDG to question Ms. Knowles as to whether insurance companies have an obligation to report agents who have violated certain licensing requirements to the North Carolina Department of Insurance. This is the question that DDG's attorney,

Mr. E. Wade Mullins, subsequently asked Ms. Knowles, and she answered in the affirmative.

DDG now contends that the Court informed DDG that it would specifically instruct the jury on the reporting requirements for insurance companies under North Carolina law. What the Court actually said to the parties at the sidebar was "[i]f the statute is an item of negligence, then I'll charge that . . . ." (10/8/03 Trial Tr.) At the charge conference, however, DDG did not specifically request this instruction. Accordingly, the Court followed its normal practice of not instructing the jury on the particular contentions of the parties, but instead allowed the parties to argue their cases as they saw fit in their closing arguments. Furthermore, even after the Court gave its instructions to the jury, the Court asked the parties if there were any objections, and DDG did not object to the Court's failure to include the specific instruction now requested.

■■■ After a careful review of the parties contentions' and the relevant portions of the trial transcript, the Court finds that its earlier decision not to specifically instruct the jury on the reporting requirements under North Carolina insurance law was not in error, and it clearly was not a miscarriage of justice. The Court notes that there was no evidence in the record indicating that DDG's injuries were actually or proximately caused by Cincinnati's alleged failure to report Massey to the North Carolina Department of Insurance. Even if there had been such evidence, the Court's general instructions on negligence and apparent authority were sufficient to allow the jury to fully consider whether Cincinnati's alleged failure to report Massey to the North Carolina Department of Insurance constituted negligence in allowing Massey to hold himself out with apparent authority. Accordingly, the Court

finds that its instructions adequately stated the relevant law to the jury.

For the foregoing reasons, therefore, DDG's Motion for New Trial/JMOL is denied in its entirety.

## V. CINCINNATI'S MOTION FOR ATTORNEYS' FEES AND RULE 11 MOTION

■■■ The Court will now consider Cincinnati's Motion for Attorneys' Fees and Rule 11 Motion, both of which are directed against DDG. As an initial matter, the Court notes that DDG has failed to respond to either of these Motions. Under Local Rule 7.3(k), if a party fails to file a timely response, "the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice." Local Rule 7.3(k), however, does not state that a motion will *necessarily* be granted. For example, as another court in this district has recently held, when deciding an uncontested motion for summary judgment, "the court must still review the motion and determine whether the moving party is entitled to judgment as a matter of law." *Carter v. Gilbarco/Marconi, Inc.*, No. 1:03CV00134, 2004 WL 1459424, at *3 (M.D.N.C. June 25, 2004) (citing *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir.1993)).

In the present case, it is unclear to the Court why DDG has failed to respond to Cincinnati's Motions, especially as each of these Motions seek the rather considerable sum of $25,530.25 in damages. Regardless, the Court finds that it is appropriate for this Court to evaluate these Motions on their merits. The Court will therefore discuss these Motions in turn.

### A. Cincinnati's Motion for Attorneys' Fees

■■■ In Cincinnati's Motion for Attorneys' Fees, Cincinnati contends that it is

entitled to attorneys' fees for the time spent defending against DDG's counterclaims for bad faith and unfair and deceptive trade practices. Cincinnati argues that these counterclaims were frivolous and DDG only pursued them in a vexatious attempt to force a settlement. Accordingly, Cincinnati moves, pursuant to Federal Rule of Civil Procedure 54(d)(2), for attorneys' fees. Cincinnati contends that it is entitled to attorneys' fees pursuant to 28 U.S.C. § 1927,[4] N.C. Gen.Stat. § 75–16.1,[5] and N.C. Gen.Stat. § 6–21.5.[6] For a number of reasons, the Court will, in its discretion, deny Cincinnati's Motion for Attorneys' Fees.

First, Cincinnati has failed to comply with the Local Rules in bringing this Motion. Local Rule 54.2, which governs motions for the award of statutory attorneys' fees, states as follows:

> The court will not consider a motion to award statutory attorney's fees until moving counsel shall first advise the court in writing that after consultation the parties are unable to reach an agreement in regard to the fee award. The statement of consultation shall set forth the date of the consultation, the names

of the participating attorneys, and the specific results achieved.

Local Rule 54.2; *see also Basnight v. Diamond Developers, Inc.,* 178 F.Supp.2d 589, 593–4 (M.D.N.C.2001) (denying a defendant's motions for attorneys' fees under N.C. Gen.Stat. § 75–16.1 in part because the defendant failed to engage in the consultation required by Local Rule 54.2). Cincinnati has offered the Court no statement or evidence that it attempted to consult with DDG regarding the amount of an attorneys' fee award prior to filing its Motion for Attorneys' Fees with this Court.

Second, after a careful review of Cincinnati's Motion for Attorneys' Fees, the Court finds that the Motion fails to show that DDG's claims of bad faith and violation of UDTPA were so frivolous as to warrant an award of attorneys' fees. Although the Court granted Cincinnati summary judgment on these claims because they were weak both legally and factually, they simply were not so frivolous as to justify a departure from the normal rule that a litigant bears his own attorneys' fees.

---

**4.** 28 U.S.C. § 1927 provides as follows:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

**5.** North Carolina General Statutes section 75–16.1 provides as follows:

In any suit instituted by a person who alleges that the defendant violated G.S. 75–1.1, the presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party, such attorney fee to be taxed as a part of the court costs and payable by the losing party, upon a finding by the presiding judge that:

(1) The party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit; or

(2) The party instituting the action knew, or should have known, the action was frivolous and malicious.

**6.** North Carolina General Statutes section 6–21.5 provides, in pertinent part, as follows:

In any civil action or special proceeding the court, upon motion of the prevailing party, may award a reasonable attorney's fee to the prevailing party if the court finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party in any pleading.

Cincinnati contends, however, that the North Carolina Appeals Court's decision in *Henry Angelo & Sons, Inc. v. Property Development Corp.*, 63 N.C.App. 569, 306 S.E.2d 162 (1983), makes it clear that DDG's claims could not be advanced against Cincinnati because Cincinnati was acting as a surety, not an insurer. In its Summary Judgment Opinion, this Court acknowledged that *Angelo* controlled the outcome of DDG's bad-faith and UDTPA claims. However, the Court's Summary Judgment Opinion makes it clear that both parties struggled with the question of the legal veracity of DDG's claims:

> As the parties seem to recognize, based on the relative lack of North Carolina cases cited in their briefs, there is not an abundance of North Carolina case law governing the issues raised by DDG's UDTPA and bad faith claims. There is, however, at least one North Carolina Court of Appeals case, *Henry Angelo & Sons, Inc. v. Prop. Dev. Corp.*, 63 N.C.App. 569, 306 S.E.2d 162 (1983), which both parties acknowledge speaks to the issue. While both parties also cite to several state cases from other jurisdictions to lend persuasive support to their respective positions, *Angelo* is the controlling North Carolina law in this diversity action.

*Cincinnati Ins. Co.*, 286 F.Supp.2d at 688–89. Furthermore, in addressing DDG's bad-faith claim, the Court noted that "[t]he fact that both parties have cited only authority from other state jurisdictions indicates that North Carolina courts have not spoken to the issue of whether an obligee may assert a bad faith cause of action against a surety." *Id.* at 690. Thus, although Cincinnati now contends that, in light of *Angelo*, DDG's bad faith and UDTPA claims were frivolous, this Court's Summary Judgment Opinion indicates that both parties made good faith arguments on this unsettled topic.

In summary, therefore, the Court will, in its discretion, deny Cincinnati's Motion for Attorneys' Fees because Cincinnati's Motion was filed in violation of the local rules and the Court does not find the claims pursued by DDG to be so frivolous as to justify the imposition of fees. The Court will now consider Cincinnati's Rule 11 Motion.

### B. Rule 11 Motion

Apparently, as an alternative to its Motion for Attorneys' Fees, Cincinnati also seeks attorneys' fees in the amount of $25,530.25 under Federal Rule of Civil Procedure 11. The Court finds this Motion to be wholly without merit. First, for substantially the same reasons discussed above with respect to Cincinnati's Motion for Attorneys' Fees, DDG's pursuit of its bad-faith and UDTPA claims simply does not warrant sanctions in this case. *Cf. Plotkin v. Association of Eye Care Centers, Inc.*, No. 88–87–CIV–5–H, 1989 WL 225766, at *5 (E.D.N.C. Sept.29, 1989) (denying a defendant's motion for attorneys' fees under N.C. Gen.Stat. § 75–16.1(2) & § 6–21.5 where it had previously denied the defendant's contemporaneous Rule 11 motion).

Second, and more fundamentally, Cincinnati has wholly failed to comply with Rule 11's safe harbor provisions in filing its Rule 11 Motion. Rule 11 states, in pertinent part, as follows:

> A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is

not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees. Fed.R.Civ.P. 11(c)(1)(A). Thus, Rule 11 provides a safe harbor which allows a party, after being presented with a Rule 11 Motion, to correct the offending conduct before the Court sees the motion.

In this case, however, Cincinnati failed to comply with the safe harbor provisions of Rule 11. There is no evidence in the record that Cincinnati served the Rule 11 Motion on DDG twenty-one days before filing it. Cincinnati apparently seeks to get around this 21–day requirement by relying on the Central District of California's decision in *Truesdell v. Southern California Permanente Medical Group*, 209 F.R.D. 169 (C.D.Cal.2002). Cincinnati characterizes Truesdell's holding as follows:

> Finally, when plaintiff's counsel complained that he had not been given proper time under Rule 11's safe harbor's provisions to respond to the motion for sanctions, the court noted that opposing counsel had sent a letter pointing out the frivolity of the plaintiff's claims, where [sic] before the motion for sanctions was filed, and that the sanctions were filed in accordance with the safeharbor's provision, Rule 11. Thus, the opposing counsel had complied with both the spirit and the intent of Rule 11.

(Cincinnati's Mem. Supp. Rule 11 Mot. at 16.)

Cincinnati's reliance upon *Truesdell* is entirely misplaced. In *Truesdell*, the defendant served the plaintiff with its Rule 11 motion on March 29, 2001. *Truesdell*, 209 F.R.D. at 172. On April 18, 2001, the court dismissed the plaintiff's complaint. *Id.* The defendant then filed its Rule 11 motion on April 23, 2001. *Id.* The plaintiff contended that it had not had a full twenty-one days to withdraw the offending complaint due to the court's intervening order dismissing the case. *Id.* at 178. The court found this argument illogical because "the [d]efendant's counsel gave the [p]laintiff's counsel more than 21 days to withdraw the ... [complaint], by serving the [m]otion for [s]anctions 25 days prior to its filing." *Id.* at 179. There is no indication from the court in *Truesdell* that it would have permitted the defendant to file a Rule 11 motion without first serving the motion on the plaintiff. Thus, Cincinnati's recitation of the facts of *Truesdell* omits the critical factor that distinguishes *Truesdell* from the present case, that is, that the moving party in *Truesdell* complied with the safe harbor provisions by first serving the Rule 11 motion on the offending party.

■ Furthermore, under clearly established Fourth Circuit law, even if Cincinnati's Rule 11 Motion had first been served on DDG, the Motion is untimely. Cincinnati waited more than three years after DDG filed its counterclaims for bad faith and violation of the UDTPA to move for Rule 11 sanctions.[7] As the Fourth Circuit Court of Appeals has held, "[i]t is important that ... a [Rule 11] motion be served promptly after the inappropriate paper is filed, and, if delayed too long, [it] may be viewed as untimely." *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 152 (4th Cir.2002) (second alteration in original) (internal quotations omitted). More

---

**7.** Cincinnati filed its Rule 11 Motion on February 18, 2004, and DDG initially asserted its counterclaims for bad faith and unfair and deceptive trade practices against Cincinnati on May 22, 2000. (*See* DDG's Mots., Answer, Counterclaims, & Crossclaims [Doc. # 20].)

importantly, however, the Fourth Circuit Court of Appeals has held that "the 'safe harbor' provisions of Rule 11(c)(1)(A) preclude the serving and filing of any Rule 11 motion after conclusion of the case." *Id.* (quoting the 1993 Advisory Committee's Note for the proposition that " '[g]iven the "safe harbor" provisions . . ., a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention).' " (second alteration in original)).

In the present case, in violation of *Hunter,* Cincinnati waited until four and a half months after this Court issued its Summary Judgment Opinion rejecting DDG's claims for bad faith and violation of the UDTPA before it filed its Rule 11 Motion. As the Fourth Circuit Court of Appeals sitting *en banc* recently reaffirmed, "[b]ecause the rule requires that the party submitting the challenged pleading be given an opportunity to withdraw the pleading, sanctions cannot be sought after summary judgment has been granted." *Brickwood Contractors, Inc. v. Datanet Eng'g,* 369 F.3d 385, 389 (4th Cir.2004) (en banc) (citing *Hunter,* 281 F.3d at 152). The Court finds, therefore, that Cincinnati has failed to comply with the safe harbor requirements of Rule 11 by failing to first serve DDG with the Rule 11 Motion before filing, by delaying so long after DDG filed its offending counterclaims against Cincinnati to file the Motion, and by waiting until after this Court issued its Summary Judgment Opinion before filing the Motion. As the Fourth Circuit Court of Appeals held in *Brickwood Contractors,* "[i]t is clear from the language of the rule that it imposes mandatory obligations upon the party seeking sanctions, so that failure to comply with the procedural requirements precludes the imposition of the requested sanctions." *Id.* As such, the Court must deny Cincinnati's Rule 11 Motion because Cincinnati has failed to comply with the safe harbor requirements of Rule 11.

Furthermore, as discussed more fully above with respect to Cincinnati's separate Motion for Attorneys' Fees, even if Cincinnati had properly filed its Rule 11 Motion, the Court would have also denied the Motion on the merits. The Court will now address BB & T's Bill of Costs to be taxed against Cincinnati.

## VI. BB & T's BILL OF COSTS SEEKING TO TAX COSTS AGAINST CINCINNATI

On November 21, 2003, BB & T filed a Bill of Costs with this Court requesting the Court tax costs against Cincinnati. In its Bill of Costs, BB & T requests a total of $96,956.86 in costs and attorneys' fees: (1) $3391.81 for deposition transcripts, (2) $80.59 for postage, (3) $130.50 for FedEx charges, (4) $1901.37 for photocopies, (5) $1911.44 for travel expenses, and (6) $89,541.15 for attorneys' fees. On December 8, 2003, Cincinnati filed its Objections to BB & T's Bill of Costs. On December 10, 2003, BB & T filed its Motion to Strike Cincinnati's Objections to BB & T's Bill of Costs. On December 22, 2003, Cincinnati filed its Motion to Redesignate and Extend. The Court will first consider BB & T's Motion to Strike, as it bears on the record the Court may look to in deciding whether to tax costs against Cincinnati.

### A. BB & T's Motion to Strike

BB & T filed a Motion to Strike Cincinnati's Objections to BB & T's Bill of Costs, asserting two primary reasons why the Objections should be stricken. First, BB & T contends that "[t]he document filed by Cincinnati is not of a type authorized by the Rules of Civil Procedure or any statute." (Mot. Strike at 1.) Second, BB & T contends that Cincinnati did not timely file its Objections to BB & T's Bill of Costs. (*Id.*) The Court will discuss BB & T's arguments in turn.

### 1. Cincinnati's Filing Is Not Authorized by the Federal Rules of Civil Procedure

 Local Rule 54.1(b) governs objections to bills of costs. It states. that "[i]f an adverse party objects to the bill of costs or any item claimed by a prevailing party, that party must state objection in a motion for disallowance with a supporting brief within 10 days after the filing of the bill of costs." Local Rule 54.1(b)(1). BB & T contends that because Cincinnati's Objections to BB & T's Bill of Costs was not entitled a "Motion for Disallowance," Cincinnati's objections must be denied under Local Rule 54.1. The Court finds this argument to be without merit. While Cincinnati should have designated its motion as a Motion for Disallowance, failure to properly title a motion is not fatal to a party's claim. It is clear that Cincinnati filed its Objections pursuant to Local Rule 54.1(b)(1) to object to the Bill of Costs filed by BB & T. The Court therefore will, in its discretion, consider Cincinnati's Objections to BB & T's Bill of Costs as a Motion for Disallowance of BB & T's Costs.

### 2. Cincinnati Did Not Timely File Its Objections

 BB & T next contends, however, that Cincinnati's Objections were not timely filed on December 8, 2003 because Cincinnati did not file its Objections within ten days as required by Local Rule 54.1(b)(1). Cincinnati contends, however, that, taking into account Federal Rules of Civil Procedure 6(a) and 6(e), it is clear that it timely filed its Objections. The Court notes that Rule 6(a) explains how courts should compute time periods prescribed in the Federal Rules of Civil Procedure and in the

Local Rules. The Court also notes that Rule 6(e) adds an additional three days for taking action if the party was served by mail.

Federal Rule of Civil Procedure 6(a) provides, in pertinent part, as follows:

> In computing any period of time prescribed ... by the local rules of any district court ..., the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday ..., in which event the period runs until the end of the next day which is not one of the aforementioned days. *When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation.* As used in this rule and in Rule 77(c), "legal holiday" includes New Year's Day, Birthday of Martin Luther King, Jr., Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas Day, and any other day appointed as a holiday by the President or the Congress of the United States, or by the state in which the district court is held.

Accordingly, under Federal Rule of Civil Procedure 6(a), because the time period specified in Local Rule 54.1(b)(1) for filing a motion for disallowance is "10 days after the filing of a bill of costs," Local Rule 54.1(b)(1) applies and "intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation."

Excluding "intermediate Saturdays, Sundays, and legal holidays,[8]" under Local

---

**8.** Pursuant to Rule 6(a), the Court has excluded Thanksgiving Day, November 27, 2003, from the computation. It has not, however, excluded the day after Thanksgiving as Cincinnati requested, because North Carolina does not recognize the day after Thanksgiving as a state holiday. N.C. Gen.Stat. § 103–4 (listing North Carolina's "legal public holidays").

Rule 54.1(b), as computed pursuant to Rule 6(a), Cincinnati had until December 8, 2003, to file its Objections. BB & T argues, however, that "intermediate Saturdays, Sundays, and legal holidays," should not be excluded. Although unclear from its briefs, BB & T's argument is apparently as follows: (1) Local Rule 54.1(b) requires a party to file its motion for disallowance within 10 days; (2) Rule 6(e) adds an additional 3 days when service is made by mail, by depositing the filing with the clerk, or by other means to which a party has given written consent; (3) thus, a party actually has 13 days to file its motion for disallowance; (4) therefore, the time prescribed is not less then 11 days; and (5) intermediate Saturdays, Sundays, and legal holidays are not excluded.

BB & T cites no authority for this position, and the Middle District authority the Court has located has held that the majority rule is to the contrary. As Chief Judge Tilley stated in *Douglas v. Sandoz Pharmaceuticals Corp.*, No. 1:98CV00911, 2000 WL 33342286 (M.D.N.C. July 18, 2000), "[t]he more widely adopted view ... is that intermediate weekends and holidays should be excluded from the ten-day period as provided in Rule 6(a), but not from the three-day period provided in Rule 6(e)." *Id.* at *3. BB & T contends, however, that the 2001 amendments to Rule 6(e) now make the majority view obsolete. BB & T fails to explain why the 2001 amendments to Rule 6(e) would change the interplay between 6(a) and 6(e) such that the Court should now include intermediate Saturdays, Sundays, and legal holidays when computing the time period pre-

scribed under Local Rule 54.1, nor does BB & T cite any authority in support of this position. In fact, the post-amendment authority the Court has located holds to the contrary. *See, e.g., Berman v. Cong. Towers Ltd. P'ship–Section I,* No. CIV.A. DKC 2002–3470, 2004 WL 1618695, at *3 (D.Md. July 20, 2004); *Golden Nugget, Inc. v. Chesapeake Bay Fishing Co., L.L.C.,* 232 F.Supp.2d 631, 632–34 (E.D.Va. 2002).[9]

In summary, therefore, the Court finds that, computing the 10–day filing requirement of Local Rule 54.1(b) in light of Federal Rule of Civil Procedure 6(a), Cincinnati's Objections were timely filed on December 8, 2003.[10] BB & T's Motion to Strike Cincinnati's Objections to BB & T's Bill of Costs is therefore denied. Furthermore, Cincinnati's Motion to Redesignate and Extend, which Cincinnati filed in order to cure any potential procedural defects in its Objections to BB & T's Bill of Costs, is denied as moot. The Court will now consider the merits of BB & T's Bill of Costs and Cincinnati's Objections to BB & T's Bill of Costs

B. BB & T's Bill of Costs and Cincinnati's Objections to BB & T's Bill of Costs

As stated above, BB & T requests that this Court tax costs to Cincinnati in the amount of $96,956.86. The Court notes that 28 U.S.C. §§ 1920–1924, Federal Rule of Civil Procedure 54(d)(1), and Local Rule 54.1 govern bills of costs. Cincinnati contends that BB & T's Bill of Costs is both procedurally and substantively defective

---

**9.** In its Reply Brief, BB & T contended that this case, which was cited by Cincinnati, was irrelevant for determining how to properly apply Rule 6(a) to Local Rule 54.1. BB & T contended that this case was not persuasive because it was decided before the amendments to Rule 6(e) and because it was decided by a magistrate judge. The Court notes, how-

ever, that each of these assertions by BB & T is incorrect.

**10.** Having found that Cincinnati's Objections were timely under Rule 6(a), the Court need not address the application of Rule 6(e) to this case.

under these rules and should therefore be denied. Specifically, Cincinnati objects to BB & T's Bill of Costs for the following reasons: (1) BB & T's attorney, Mr. Donald G. Sparrow, failed to attach an affidavit to the Bill of Costs in violation of 28 U.S.C. § 1924; (2) attorneys' fees are not costs that can be taxed under Rule 54(d)(1); (3) even if BB & T had properly filed its request for attorneys' fees pursuant to Rule 54(d)(2), there is no basis upon which to award BB & T attorneys' fees; and (4) BB & T seeks reimbursement of costs that are not allowed under § 1920. The Court will discuss Cincinnati's objections in turn.

· 1. BB & T's Attorney Failed to Attach an Affidavit Supporting BB & T's Bill of Costs

■ Cincinnati's first contention is that the Bill of Costs must be denied because Mr. Sparrow did not attach an affidavit to the bill of costs supporting the necessity and correctness of the bill of costs. The Court notes that 28 U.S.C. § 1924 provides as follows:

> Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed.

The Court has examined BB & T's Bill of Costs, as well the accompanying Request for Taxing of Costs, and the Court finds that Mr. Sparrow has not complied with § 1924 because he did not attach an affidavit supporting the Bill of Costs. The Court notes that had Mr. Sparrow simply used the AO133 form provided by the clerk's office, he would have been in compliance. However, although the Court could excuse Mr. Sparrow's failure to use the proper form had he at least attached

an affidavit verifying the Bill of Costs, it cannot excuse his failure to comply with § 1924. *United States v. Hiland,* 909 F.2d 1114, 1142 (8th Cir.1990) (finding that the district court abused its discretion by granting costs where, among other problems, the party seeking the taxing of costs failed to file a verified bill of costs).

The question, therefore, is how the Court should proceed in light in Mr. Sparrow's failure to comply with § 1924. The Court notes that the Northern District of Illinois has previously held that " '[w]hile it may be preferable for a party to file supporting documentation and authority along with (the bill of costs), 28 U.S.C. § 1924 does not appear to require it.' " *Sullivan v. Cheshier,* 991 F.Supp. 999, 1001 (N.D.Ill. 1998) (quoting *Piraino v. Int'l Orientation Resource,* No. 94 C 493, 1997 WL 222948, at *2 (N.D.Ill. Apr.30, 1997)). The court in *Sullivan* noted that "[a]n affidavit is only required under Section 1924 'before any bill of costs is taxed.' " *Id.* (quoting *Piraino* ). The Court therefore, in its discretion, will consider Cincinnati's Objections on their merits. If, after considering these Objections, it appears to the Court that BB & T has in fact submitted costs which are properly taxable, the Court will grant BB & T leave to amend its Bill of Costs by supplying an affidavit supporting the correctness and necessity of these costs. *Cf. Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.,* 12 F.Supp.2d 499, 501 n. 4 (D.Md.1998) (granting a party leave to file an amended bill of costs where the party had failed to attach an affidavit to its initial bill of costs).

2. Attorneys' Fees Are Not Properly Taxable as Costs Under Rule 54(d)(1)

■ Cincinnati's second contention is that attorneys' fees are not properly taxable under Federal Rule of Civil Proce-

dure 54(d)(1) and Local Rule 54.1 (which the Court notes construes Federal Rule 54(d)(1)), but instead must be made by motion pursuant to Rule 54(d)(2) and Local Rule 54.2 (which the Court notes construes Federal Rule 54(d)(2)). The pertinent provisions of these subsections of Rule 54(d) provide as follows:

(d) Costs; Attorneys' Fees.

■■■ (1) Costs Other than Attorneys' Fees. Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs.... Such costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

(2) Attorneys' Fees.

(A) Claims for attorneys' fees and related nontaxable expenses shall be made by motion unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial.

(B) Unless otherwise provided by statute or order of the court, the motion must be filed no later than 14 days after entry of judgment; must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought. If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made.

. . . .

(D) By local rule the court may establish special procedures by which issues relating to such fees may be resolved without extensive evidentiary hearings.

Thus, as the text of 54(d)(1)-(2) makes clear, a request for attorneys' fees may not be made by simply submitting a Bill of Costs. Instead, under Local Rule 54.2, a *motion* for attorneys' fees must be filed with the Court.

BB & T contends, however, that it has filed its request for attorneys' fees pursuant to Rule 54(d)(1) because "where authorized by law attorneys' fees can be taxed as costs and awarded to the prevailing party." (BB & T's Br. Supp. Mot. Strike [Doc. # 235] at 4.) BB & T's argument misses the point of the Federal and Local Rules. Rule 54(d)(1) states that "costs *other than attorney's fees* shall be allowed as of course to the prevailing party ...." As Rule 54(d)(2) makes clear, "[c]laims for attorneys' fees and related nontaxable expenses shall be made by motion *unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial.*" In the present case, the recovery of attorneys' fees was not an element of damages that would have been proved at trial; therefore, BB & T's request for attorneys' fees must comply with Federal Rule 54(d)(2) and Local Rule 54.2. As discussed above with respect to Cincinnati's Motion for Attorneys' Fees, Local Rule 54.2 requires a party moving for attorneys' fees to "first advise the court in writing that after consultation the parties are unable to reach an agreement in regard to the fee award." Local Rule 54.2; *see also Basnight v. Diamond Developers, Inc.*, 178 F.Supp.2d 589, 594 (M.D.N.C.2001). There is no evidence that BB & T engaged in this consultation. Accordingly, its request for attorneys' fees is defective on this basis as well.

### 3. There Is No Basis Upon Which to Award BB & T Attorneys' Fees

■ Cincinnati further contends that even if BB & T had properly filed its request for attorneys' fees, BB & T has cited no legally cognizable basis upon which this Court can base an award of fees. BB & T contends, however, that it is entitled to attorneys' fees under the North Carolina Supreme Court's decision in *Horner v. Chamber of Commerce*, 236 N.C. 96, 72 S.E.2d 21 (1952). The Court notes that in *Horner*, the supreme court held that:

a court in the exercise of equitable jurisdiction, may in its discretion, and without statutory authorization, order an allowance for attorney fees to a litigant who at his own expense has maintained a successful suit for the preservation, protection, or increase of a *common fund* or of common property, or who has created at his own expense or brought into court a fund which others may share with him.

*Id.* at 97–98, 72 S.E.2d at 22 (emphasis added).

The Court finds *Horner* to be inapplicable to the present case. As subsequent North Carolina decisions have made clear, *Horner* only applies to "common fund" cases. For example, in *Taylor v. City of Lenoir*, 148 N.C.App. 269, 558 S.E.2d 242 (2002), the North Carolina Court of Appeals held that "[f]irst and foremost, [the North Carolina] Supreme Court has consistently held that attorney's fees may only be awarded from monies that are actually 'recovered' by the litigation." *Id.* at 277, 558 S.E.2d at 248. In the present case, BB & T has failed to recover any funds from Cincinnati. Accordingly, the equitable doctrine articulated by the North Carolina Supreme Court in *Horner* does not support awarding attorneys' fees to BB & T.

In conclusion, therefore, BB & T's request for attorneys' fees is denied. BB & T has wholly failed to comply with the Federal and Local Rules in requesting attorneys' fees, and it has cited no statute or case law supporting its request for attorneys' fees. Furthermore, as Cincinnati also points out, BB & T has offered no evidence whatsoever of the reasonableness of its $89,541.15 fee request. It has failed to supply any billing records or any other information that would assist the Court in determining the reasonableness of the hours BB & T's counsel expended or the reasonableness of the rates charged. Accordingly, for all of the foregoing reasons, the Court will, in its discretion, decline to award attorneys' fees to BB & T.

### 4. BB & T's Requested Costs Do Not Comply with the Requirements of 28 U.S.C. § 1920

Cincinnati finally contends that the costs that BB & T requests to have taxed against Cincinnati do not comply with 28 U.S.C. § 1920. Section 1920 provides, in pertinent part, as follows:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

As this Court previously held in *AM Properties v. Town of Chapel Hill*, 202 F.Supp.2d 451 (M.D.N.C.2002), "[c]onsistent with the discretion to interpret the taxable items enumerated in § 1920, a district court has the power to further delineate by local rules those expenditures that may be taxed as costs as long as the district court's interpretation is consistent with the applicable federal statutes and rules." *Id.* at 453. In the Middle District, Local Rule 54.1 provides, in pertinent part, as follows:

(c) Taxable Costs.

 (1) Items normally taxed include, without limitation:

 (i) Those items specifically listed on the bill of costs form. The costs incident to the taking of depositions (when allowable as necessarily obtained for use in the litigation) normally include only the reporter's attendance fee and charge for one transcript of the deposition.

 (ii) Premiums on required bonds.

 (iii) Actual mileage, subsistence, and attendance allowances for necessary witnesses at actual cost, but not to exceed the applicable statutory rates, whether they reside in or out of this district.

 (iv) One copy of the trial transcript for each party represented by separate counsel.

 (2) Items normally not taxed include, without limitation:

 (i) Witness fees, subsistence, and mileage for individual parties, real parties in interest, parties suing in representative capacities, and the officers and directors of corporate parties.

 (ii) Copies of depositions.

 (iii) Daily copy of trial transcripts, unless prior court approval has been obtained.

In the present case, BB & T requests that the following costs be taxed against Cincinnati: (a) $3391.81 for deposition transcripts, (b) $80.59 for postage and $130.50 for FedEx charges, (c) $1901.37 for photocopies, and (d) $1911.44 for travel expenses. The Court will consider Cincinnati's objections in turn.

 a. Deposition Transcripts

 Cincinnati contends that BB & T's request for $3391.81 for deposition transcripts should be denied because courts have interpreted § 1920(2) as providing only costs "for depositions used in trial or for depositions of persons called as witnesses during trial." (Cincinnati's Objections BB & T's Bill Costs at 4 (citing *Kehm v. Proctor & Gamble Co.*, 580 F.Supp. 890 (N.D.Iowa 1982)).) The Court notes, however, that in the Fourth Circuit, "in determining whether to award deposition costs, a court [must] examine[ ] whether the deposition was reasonably necessary to the prevailing party's case at the time it was taken, not whether it was actually admitted at trial." *Simmons v. O'Malley*, 235 F.Supp.2d 442, 443 (D.Md.2002) (citing *LaVay Corp. v. Dominion Fed. Savings & Loan Ass'n*, 830 F.2d 522, 528 (4th Cir. 1987).) Thus, "[a] district court should award costs when the taking of a deposition is reasonably necessary at the time of its taking . . . ." *LaVay Corp.*, 830 F.2d at 528. "The material from the deposition need not be used at trial, but need only be 'relevant and material' for the preparation in the litigation." *Cofield v. Crumpler*, 179 F.R.D. 510, 518 (E.D.Va.1998) (quoting *Scallet v. Rosenblum*, 176 F.R.D. 522, 526 (W.D.Va.1997).) "The proper inquiry is whether the deposition was 'necessary to counsel's effective performance and proper handling of the case.'" *Id.* (quoting *Marcoin, Inc. v. Edwin K. Williams & Co.*, 88 F.R.D. 588, 590 (E.D.Va.1980)). "The deposition need only have seemed necessary

at the time of the taking of the deposition." *Id.* (citing *Jop v. City of Hampton,* 163 F.R.D. 486, 488 (E.D.Va.1995)).

In the present case, the Court cannot make a determination, based upon the documentation provided by BB & T, whether the deposition expenses BB & T requests be taxed against Cincinnati were "reasonably necessary." The Court notes that while Cincinnati vigorously contends that these expenses, save for two depositions, should be disallowed, Cincinnati has cited no Fourth Circuit case law in support of its position. Therefore, the Court will, in its sound discretion, grant BB & T leave to refile its Bill of Costs to properly support its request that some or all of its deposition expenses should be taxed against Cincinnati.

b. Postage and FedEx Charges

■ Cincinnati objects to the full amount of BB & T's request for postage and FedEx charges, contending that these costs are not allowable. BB & T has offered no response supporting its position that these costs are properly taxable to Cincinnati. As this Court previously held in *AM Properties,* "courts have generally not allowed the inclusion of mailing expenses as a taxable cost, absent special circumstances." *AM Props.,* 202 F.Supp.2d at 456. In the present case, the Court finds that BB & T has failed to present any special circumstances justifying an award of costs for postage and FedEx charges. The Court will therefore disallow these costs.

c. Photocopies

■ Cincinnati further contends that BB & T's request for copy charges in the amount of $1901.37 must be denied. Relying almost exclusively upon non-Fourth Circuit case law, Cincinnati argues that the Court should not award full copying expenses to BB & T. As this Court has previously held, requests for photocopying

are taxable as long as they are necessarily obtained for use in the case. *AM Props.,* 202 F.Supp.2d at 455. In the present case, BB & T has failed to provide any evidence or argument supporting the reasonableness of its photocopying expenses. However, the Court will, in its sound discretion, grant BB & T leave to refile its Bill of Costs to properly support its contention that these copies were necessarily obtained for use in this case.

d. Attorneys' Travel Expenses

■ Cincinnati finally contends that BB & T's request that its attorneys' travel expenses of $1911.14 be taxed to Cincinnati should be denied in its entirety. This Court has previously held that attorneys' travel expenses are not recoverable under § 1920. *AM Props.,* 202 F.Supp.2d at 455. Accordingly, the Court will disallow these costs.

5. Conclusion with Respect to BB & T's Bill of Costs and Cincinnati's Objections to BB & T's Bill of Costs

For the foregoing reasons, therefore, the Court will disallow BB & T's Bill of Costs in its entirety. However, the Court will, in its discretion, allow BB & T to file an amended Bill of Costs supporting the reasonableness and necessity of its deposition and photocopying (and only these) expenses. The Court cautions BB & T's counsel that the amended Bill of Costs must comply with 28 U.S.C. § 1920–1924, Federal Rule of Civil Procedure 54(d)(1), Local Rule 54.1, and controlling case law interpreting these rules. Furthermore, the amended Bill of Costs must be filed within 10 days of the entry of this Court's Order and Judgment.

VII. CINCINNATI'S BILL OF COSTS AND DDG'S MOTION FOR DIS-ALLOWANCE

■ Cincinnati has also filed a Bill of Costs against DDG, requesting the Court

to tax costs against DDG because Cincinnati prevailed at summary judgment and at trial. DDG has filed a Motion for Disallowance, contending that Cincinnati has prematurely filed its Bill of Costs and requesting the Court to dismiss Cincinnati's Bill of Costs without prejudice to its right to refile the Bill of Costs at the appropriate time. Cincinnati has failed to file a response to DDG's Motion for Disallowance.

The Court finds that Cincinnati has in fact filed its Bill of Costs prematurely. In the Middle District of North Carolina, Local Rule 54.1(a)(1) specifies the timetable for filing a bill of costs. It provides as follows:

> (1) A prevailing party may request the clerk to tax allowable costs in a civil action as a part of a judgment or decree by filing a bill of costs, on a form available in the clerk's office, within 30 days
>> (i) after the expiration of time allowed for appeal of a final judgment or decree, or
>> (ii) after receipt by the clerk of an order terminating the action on appeal.

The Court notes that it entered its Judgment Upon Jury Verdict on October 16, 2003. Accordingly, had DDG not filed its Motion for New Trial/JMOL on October 22, 2003, DDG's time for filing an appeal under Federal Rule of Appellate Procedure 4(a)(1)(A) would have expired on November 15, 2003, and Cincinnati's Bill of Costs would have been appropriately filed on December 16, 2003. However, because DDG filed its Motion for New Trial/JMOL on October 22, 2003, which the Court is ruling upon in this Opinion, DDG will have thirty days from the entry of this Court's present Order to file its notice of appeal. *See* Fed. R.App. P. 4(a)(4). In summary, because DDG's time for filing an appeal has not expired, Cincinnati's Bill of Costs was filed prematurely. Local Rule

54.1(a)(1)(i). The Court will therefore disallow Cincinnati's Bill of Costs without prejudice to Cincinnati's right to refile the Bill of Costs at the appropriate time.

## VIII. CONCLUSION

For the foregoing reasons, therefore, DDG's Motion for New Trial or in the Alternative Judgment as a Matter of Law [Document # 227] is denied. Cincinnati's Motion to Recover Attorney Fees Pursuant to Rule 54(d)(2) [Document # 244] and Motion to Recover Attorney Fees Pursuant to Rule 11 ("Rule 11 Motion") [Document # 246] are denied. BB & T's Motion to Strike Cincinnati's Filing Entitled "Cincinnati's Objection to BB & T's Bill of Costs" [Document # 234] is denied. As such, Cincinnati's Motion to Redesignate Objection to Bill of Costs as Motion to Disallow and Motion for Extension of Time the Same [Document # 237] is denied as moot. BB & T's Bill of Costs [Document # 231] is disallowed, but BB & T is granted leave to refile its Bill of Costs in accordance with the attached Order. Cincinnati's Objections to BB & T's Bill of Costs [Document # 233] is therefore granted. Cincinnati's Bill of Costs [Document # 236] is disallowed without prejudice to Cincinnati's right to refile the Bill of Costs at the appropriate time. Accordingly, DDG's Motion for Disallowance of Cincinnati's Bill of Costs [Document # 241] is granted.

An Order and Judgment consistent with this Memorandum Opinion shall be filed contemporaneously herewith.